2021 IL App (1st) 210824-U

No. 1-21-0824

Order filed December 6, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.S., | ) | |
| | ) | |
| Minor-Appellee, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 19 JA 1524 |
| A.G., | ) | |
| | ) | |
| Mother-Respondent-Appellant, | ) | |
| | ) | Honorable |
| and | ) | Andrea Buford, |
| | ) | Judge, presiding. |
| B.S. a/k/a W.S., | ) | |
| | ) | |
| Father-Respondent-Appellee). | ) | |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The trial court's findings in this matter are affirmed where: (1) the petition for adjudication of wardship stated a proper cause of action; and (2) respondent's statutory right of presence was not violated where the adjudicatory and dispositional hearings were conducted by audio-video conference, using an internet-based video-conference platform, Zoom Video Communications (Zoom).

¶ 2    On March 2, 2016, the minor L.S. was born to his mother, respondent A.G., and his father, B.S. a/k/a W.S. A.G. and W.S. stopped living together when L.S. was one year old. Protracted custody proceedings in domestic relations court eventually resulted in a shared custody agreement between respondent and W.S.

¶ 3    On November 12, 2019, respondent obtained an emergency order of protection against W.S., based on allegations that L.S. was sexually abused by W.S. While the Department of Children and Family Services (DCFS) investigated the accusations, W.S. was prohibited from having contact with L.S.

¶ 4    The investigation by DCFS determined that respondent's allegations were not corroborated and they were unfounded. On December 19, 2019, the State filed a petition for adjudication of wardship alleging that L.S. was a neglected and abused minor due to respondent's actions. The trial court entered findings of probable cause, urgent and immediate necessity, and determined that reasonable efforts could not prevent or eliminate the need to remove L.S. from the home. The court awarded temporary custody of L.S. to Janet Wukas-Ahern, the guardianship administrator for DCFS.

¶ 5    On December 30, 2019, the trial court conducted a second temporary custody hearing and amended the custody order to grant W.S. custody of L.S., subject to a section 2-25 order of protection (705 ILCS 405/2-25 (West 2018)). Respondent was granted supervised visits with L.S.

¶ 6    On March 11, 2021, the court held an adjudicatory hearing. L.S. was adjudged a neglected minor based on an injurious environment and lack of care (705 ILCS 405/2-3(1)(a), (b) (West

2020)). A dispositional hearing immediately followed. The trial court adjudged L.S. a ward of the court, found respondent unable to care for, protect, train, or discipline the minor, and found W.S. fit, able, and willing to care for, protect, train, and discipline the minor.

¶ 7    The trial court then granted W.S.'s motion to close the proceedings and: (1) vacated the previous order of protection, (2) found the family to no longer require court monitoring, and (3) found it to be in the best interests of L.S. to close the case. Legal custody was ordered to stand in W.S., and supervised clinical visitation was ordered to continue for respondent subject to the terms of an agreed mediation order.

¶ 8    On April 7, 2021, respondent filed a motion to reconsider. On June 11, 2021, the trial court denied respondent's motion. Respondent filed a timely notice of appeal on July 7, 2021. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Illinois Supreme Court Rule 303 (eff. July 1, 2017).[1]

¶ 9                                    I. BACKGROUND

¶ 10    On December 19, 2019, the State filed a petition for adjudication of wardship in this matter. A temporary custody hearing was held the same day. Respondent appeared in court, but W.S. did not. The State's petition alleged L.S. was a neglected or abused minor under sections 2-3(1)(a), 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b), 2-3(2)(ii) (West 2018)) based on the following facts:

"Mother has made multiple allegations of sexual and physical abuse against father and numerous paternal relatives. The minor has been evaluated numerous times by medical professionals with no corroboration of mother's allegations.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Minor has never reported that he has been abused. Mother is the only person who states that minor says he has been abused. Domestic Relations Court has suspended father's visits pending DCFS investigation. Mother has made numerous unusual outbursts in court, doctor's office, and DCFS office. Mother had to be removed from the CAC[2] by Chicago Police during one outburst. DCFS has requested mother do a psychiatric examination and mother has refused. Mother is not allowing access to minor. Paternity has been established."

¶ 11    The State also filed a motion for temporary custody and a supporting affidavit from the Division of Child Protection (DCP) Investigator Karen Goldmeier. Ms. Goldmeier alleged that L.S. was currently at risk based on concerns regarding respondent's mental health status. Ms. Goldmeier's affidavit alleged:

"The 4-year-old minor, [L.S.], is currently at risk under the care of his biological mother, [respondent], due to mental health concerns. The mother has failed to complete a mental health evaluation requested by the Department of Child Protection. The minor's primary care physician, Northbrook police, the father's attorney have expressed fear for the safety of the minor due to the observations of the mother's erratic behavior and statements the mother has made. The mother has refused access to the 4-year-old minor."

¶ 12    Ms. Goldmeier testified in support of DCFS's recommendation that the minor be removed from his home and placed with the guardianship administrator. While investigating respondent's allegations that W.S. sexually abused L.S., DCFS became concerned about respondent's mental

_____

[2]"CAC" refers to the Children's Advocacy Center.

health. Respondent failed to cooperate with DCFS and refused to complete a mental health assessment. In domestic relations court, respondent was heard announcing her intent to never turn L.S. over to W.S. Respondent also failed to cooperate with DCFS's efforts to take protective custody of L.S.

¶ 13    The trial court found probable cause to believe that L.S. was neglected and that an urgent and immediate necessity existed to remove him from respondent's care. The trial court found that respondent had made multiple uncorroborated allegations of sexual and physical abuse against W.S. These allegations resulted in W.S.'s visitation with L.S. being suspended pending DCFS's investigation of this matter. Respondent refused to submit to a psychiatric examination and refused to grant DCFS access to L.S. As such, the court found that reasonable efforts could not prevent or eliminate the need to remove L.S. from his home. The trial court issued a child protection warrant for L.S. and appointed Janet Wukas-Ahern as temporary guardian *ad litem*.

¶ 14    Respondent argued with the trial judge, who repeatedly told her that she failed to cooperate with DCFS and needed to do so going forward. Pending further investigation, respondent was given supervised visitation with L.S. L.S. was placed temporarily in the custody of his paternal grandmother.

¶ 15    On December 30, 2019, respondent and W.S. both appeared in juvenile court before a different trial judge[3] for reconsideration of the temporary custody order. The Cook County Public Guardian (Public Guardian) and the State now recommended that custody of L.S. be given to W.S. A lengthy evidentiary hearing followed at which Ms. Goldmeier provided additional testimony detailing facts established during the ongoing investigation by DCFS.

---

[3]The Honorable Patrick T. Murphy presided over this hearing.

¶ 16 Evidence adduced at the hearing established that on November 12, 2019, respondent applied for and was granted an emergency order of protection against W.S. That same day, L.S.'s case came to the attention of DCFS upon their receipt of a hotline call of sexual abuse. Ms. Goldmeier, who held a master's degree in social work from the University of Illinois, was assigned to L.S.'s case.

¶ 17 By the time the hotline call was placed, the Northbrook Police Department was already investigating this matter, and L.S. had seen two doctors regarding the sex abuse allegations. Ms. Goldmeier spoke with Detective Theresa Drews, who was one of the investigating officers. Detective Drews had "concerns" about respondent because she provided inconsistent reports of what L.S. told her had happened to him.

¶ 18 Ms. Goldmeier testified that medical records from St. Mary's Hospital were compared with respondent's claim that during L.S.'s examination that he "popped his butt upward which was too sexual for her liking ***." However, the hospital records established that L.S. was smiling, playful, and made no allegations of abuse. A rape kit taken at St. Mary's Hospital revealed no physical evidence of abuse to L.S.

¶ 19 Detective Drews also informed Ms. Goldmeier that respondent failed to disclose that she made a police report with the Arlington Heights Police Department before making the same complaint with the Northbrook Police Department.

¶ 20 After L.S. was examined at St. Mary's Hospital, respondent took him to Northwest Community Hospital for a second medical examination. That examination also failed to reveal any physical evidence of abuse.

¶ 21 On November 13, 2019, Ms. Goldmeier spoke with respondent and learned more family history, including the fact that W.S. had previously obtained an order of protection against

respondent. In 2017, after respondent participated in family therapy, she was allowed unsupervised visitation with L.S. from Saturday to Monday. L.S. resided with W.S. for the remainder of the week. In February of 2019, a judge in domestic relations court granted respondent and W.S. shared custody of L.S.

¶ 22    W.S. moved from Chicago to Arlington Heights in August of 2019. Respondent alleged that after the move, L.S. told her that W.S.'s cousin and uncle were hitting L.S. in the basement of their Northbrook home. Respondent brought these claims to W.S.'s attention, but he denied them.

¶ 23    On November 19, 2019, L.S. participated in a victim-sensitive interview (VSI) at the CAC.[4] Detective Drews and Ms. Goldmeier observed the interview. According to Ms. Goldmeier, L.S. did very well and answered all of the questions asked of him. L.S. denied reporting that anyone did anything to his penis or that anything "had happened to him." L.S. also denied that anyone harmed him at his grandmother's house. L.S. said that he loved W.S.

¶ 24    After the interview, Ms. Goldmeier and Detective Drews spoke with respondent. Respondent became irate when Ms. Goldmeier and Detective Drews recommended that L.S. receive therapeutic services. Respondent also demonstrated paranoid thinking, accusing W.S. of "cloning" her phone and breaking into her home and installing surveillance cameras.

¶ 25    The investigation continued. L.S.'s primary care physician, Dr. Christina C. Cedeno, M.D., informed Ms. Goldmeier that she also had concerns about respondent's behavior. Dr. Cedeno reported that respondent began making sexual abuse allegations in July of 2019, when she claimed that L.S. displayed sexualized behavior and had a red anus. Respondent became agitated during

---

[4]The VSI has not been included in the record on appeal.

this appointment. W.S. was present at this appointment as well. L.S.'s physical examination revealed no abnormality.

¶ 26     On December 9, 2019, respondent brought L.S. to the doctor's office for an examination but left when she learned that Dr. Cedeno would be conducting the examination.

¶ 27     On December 10, 2019, respondent met with Ms. Goldmeier and her supervisor. Respondent was asked to complete a mental health assessment. When respondent asked DCFS to release information concerning the pending investigation of this matter to the Mexican consulate, respondent refused to allow DCFS to explain that such information could not be legally released because it involved a pending investigation. Respondent then began addressing Ms. Goldmeier's supervisor as "Babe" and "Doll." After respondent became increasingly aggressive, she was asked to leave. Respondent refused to leave the building, and Ms. Goldmeier was directed to get security. Respondent moved to the hallway and continued to yell at staff. Eventually, a detective assigned to the building stopped to monitor the situation. Ms. Goldmeier testified that multiple similar incidents increased DCFS's concern about respondent's mental health.

¶ 28     On December 18, 2019, Detective Drews told Ms. Goldmeier that the police believed there was insufficient evidence to initiate criminal charges against W.S. Moreover, Detective Drews was concerned about respondent's mental health. Respondent believed that someone had installed cameras in her home. She also related that she found a notebook in her home that contained a "pro" and "con" list of whether someone was or was not a criminal.

¶ 29     That same day, respondent sent an email to DCFS refusing to either get a mental health evaluation or allow DCFS to see her medical records, which, according to respondent, included a previous psychiatric evaluation.

¶ 30    On December 24, 2019, Ms. Goldmeier attended a hearing in domestic relations court. She testified that DCFS would be recommending unfounding the allegations against W.S. The trial court then vacated the order of protection.

¶ 31    The child protection warrant for L.S. was executed when respondent handed him over to Ms. Goldmeier at a coffee shop at Halsted and Diversey Avenues. Ms. Goldmeier testified that respondent was understandably upset, but police intervention became necessary when respondent became verbally aggressive. For a period of time following the transfer of custody to DCFS, respondent was not allowed to visit with L.S. because of threats she made to Ms. Goldmeier and her supervisor.

¶ 32    Ms. Goldmeier testified that W.S., who resided with his mother, moved out of his mother's home when she was given temporary custody of L.S. Ms. Goldmeier recommended that L.S. be returned to W.S.'s care under a section 2-25 order of protection (705 ILCS 405/2-25 (West 2018)) and that L.S. receive services for apparent signs of trauma. Ms. Goldmeier opined that such disposition was in L.S.'s best interest where no credible evidence established that L.S. was sexually abused and where DCFS had no concerns about returning L.S. to his father's care.

¶ 33    DCFS remained concerned about L.S.'s safety insofar as respondent was concerned and needed respondent to complete a mental health assessment or provide a copy of a previously completed mental health assessment.

¶ 34    W.S. also testified at the hearing. W.S. testified that he was a waiter at a country club in Arlington Heights. He and respondent did not get along. W.S.'s greatest concern was respondent's aggression towards him in front of L.S.

¶ 35    Respondent provided testimony as well. Respondent testified that she last worked as a server at a restaurant. After graduating from Buffalo Grove High School, respondent attended

Harper College for a year and a half. In the summer of 2018, when respondent and W.S. received shared custody of L.S., the two were getting along. Respondent decided to "take" L.S. on November 8, 2019, when he asked her to put her finger in his butt and push to make him feel good. Respondent testified that she believed what L.S. told her.

¶ 36 The trial court found probable cause to believe that L.S. was a neglected minor but that no urgent and immediate necessity existed to require removing L.S from his home. An amended temporary custody order was entered, returning L.S. to W.S.'s custody, subject to an order of protection. The terms of the order included a requirement that W.S. ensure that L.S. receive at least three weekly supervised visits with respondent. The court also entered a mediation/facilitation order which required respondent and W.S. to participate in scheduled sessions to resolve issues related to visitation, services, litigation, court process, and communication.

¶ 37 The matter was continued for status hearings on January 7, 2020, March 16, 2020, and July 14, 2020. On November 17, 2020, respondent filed an "Objection to Conducting the Adjudicatory Hearing by Videoconference." On November 30, 2020, the State filed a response to respondent's motion. On December 8, 2020, respondent filed a reply. On December 10, 2020, the trial court made findings of fact and denied respondent's motion for an in-person hearing.

¶ 38 The adjudicatory and dispositional hearings were scheduled to occur on March 11, 2021. On March 9, 2021, W.S. filed a "Motion for Case Closure" under section 2-31 of the Act (705 ILCS 405/2-31 (West 2020))." On March 10, 2021, respondent filed a "Memorandum in Support of Father's Motion to Vacate the 2-25 Order of Protection and Cross-Motion to Dismiss" (cross-motion). The cross-motion sought pretrial dismissal of the petition for adjudication of

wardship on three separate bases. First, respondent relied on *In re Z.L.*, 2020 IL App (1st) 200151,[5] to support her claim that pre-adjudicatory dismissal was appropriate based on "evidence" that arose since the temporary custody hearings were conducted. Second, respondent moved for dismissal of the petition pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)). Third, respondent moved for involuntary dismissal based on defects or defenses pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2020)).

¶ 39 On March 11, 2021, the prearranged date for both the adjudicatory and dispositional hearings, respondent filed a "Supplement to Mother's Motion to Dismiss" (supplemental motion). Respondent moved for consideration of her motions before the trial court commenced the adjudicatory hearing. W.S. objected, noting that respondent had not served him with a copy of the supplemental motion and that the parties were prepared for trial. The court found that respondent's cross-motion "wasn't timely filed" and that W.S. was not served a copy of respondent's supplemental motion. The court indicated that it was proceeding with the trial.

¶ 40 The adjudicatory hearing commenced. Ms. Goldmeier testified that she was assigned to investigate this matter after DCFS received a hotline call on November 8, 2019. On November 13, 2019, Ms. Goldmeier spoke with respondent at her home. Respondent related that she and W.S. had a two-year relationship that ended shortly after the birth of L.S. There was physical, verbal, and emotional domestic violence in the relationship. Respondent claimed that W.S. instigated an incident that resulted in an order of protection being entered against her. Between 2017 and 2019, respondent had unsupervised visitation with L.S. from Saturday to Monday. In February of 2019,

---

[5]PLA allowed February 25, 2021, No. 126931.

W.S. and respondent were awarded shared custody of L.S. Respondent was displeased when W.S. moved from Chicago to Arlington Heights in August of 2019.

¶ 41 Respondent related that she accused W.S. of sexual abuse based on an incident after L.S. returned from W.S.'s home. L.S. asked respondent to insert her finger into his anus because it felt good. Respondent immediately took L.S. to the hospital for an examination. Later that night, L.S. woke up screaming in the middle of the night. He would not tell respondent who was hurting him or why he was upset and scared. Respondent began playing a game with L.S. where he would provide clues as to who his abuser was. He described the person as a man with a beard and green eyes, which respondent said matched W.S. Respondent took steps to start an investigation and obtained an emergency order of protection against W.S. on November 12, 2019.

¶ 42 Ms. Goldmeier further testified that at the VSI that took place on November 19, 2019, L.S. denied any sexual abuse. He denied that anyone touched his private parts. He denied telling anyone that anything of a sexual nature had occurred. Following the interview, Ms. Goldmeier and Detective Drews spoke to respondent about the next steps in the investigation process. Since L.S. did not disclose any abuse, Ms. Goldmeier and Detective Drews recommended that L.S. begin therapy "to process whether any abuse had occurred and have him be comfortable to disclose it at a later date if there was any abuse occurring." Respondent reacted by becoming very hostile and verbally aggressive. She yelled and accused Ms. Goldmeier and Detective Drews of not responding to her or answering her questions. Respondent was told that the investigation was ongoing to determine whether any basis existed for finding that L.S. was abused.

¶ 43 Ms. Goldmeier testified that respondent appeared to be paranoid and depressed. She told Ms. Goldmeier and Detective Drews that W.S. had cloned her phone. Detective Drews told

respondent to file a police report with the Chicago Police Department if she believed that this had occurred.

¶ 44    On December 10, 2019, respondent spoke on the phone with Ms. Goldmeier and her supervisor. Respondent was again assured that the investigation was ongoing. Respondent was concerned that W.S. coached L.S. not to disclose that he was sexually abused. Ms. Goldmeier recommended that respondent receive a mental health assessment because Ms. Goldmeier believed that respondent was displaying signs of paranoia and acting aggressively. Initially, respondent agreed. She told Ms. Goldmeier that an assessment had been completed as part of her custody agreement with W.S. and that she would send it to her. Respondent also agreed to go to Stroger Hospital for a mental health assessment on the following day. Ms. Goldmeier provided respondent with the necessary referral and also provided a referral to enable L.S. to receive therapy.

¶ 45    Ms. Goldmeier testified that on December 12, 2019, she and her supervisor left a voicemail on respondent's phone when she did not answer the call.

¶ 46    On December 13, 2019, respondent called Ms. Goldmeier's supervisor to inform her that she was coming to DCFS's office with a form for the Mexican consulate. Upon arriving, respondent gave them a release for DCFS to provide information concerning this matter to the Mexican consulate. Respondent refused to allow Ms. Goldmeier and her supervisor to explain that pending investigations cannot be shared because they are confidential.

¶ 47    Ms. Goldmeier testified that respondent was combative and began yelling. When respondent then spoke to someone on her phone in Spanish, Ms. Goldmeier's supervisor requested a Spanish-speaking investigator to come to her office to act as a translator. Respondent responded by accusing Ms. Goldmeier and the supervisor of "having a problem" with her speaking in Spanish

and told the Spanish-speaking investigator that he could leave because she would continue to speak in English.

¶ 48    Respondent then referred to the supervisor as "Babe," and when the supervisor told respondent that this was inappropriate, respondent referred to her as "Doll." When respondent became increasingly louder, she was asked to leave. Respondent then walked to the hallway and continued yelling, accusing Ms. Goldmeier and her supervisor of not doing their jobs. A detective who was passing by stopped to monitor the situation. The supervisor then contacted building security to escort respondent out of the building.

¶ 49    On December 17, 2019, in a telephone conversation, respondent told Ms. Goldmeier that she had not yet completed the mental health assessment but would do it the following day. Respondent again agreed to send Ms. Goldmeier her assessment from the previous domestic relations case. Respondent did neither. Instead, on December 18, 2019, respondent sent an email in which she refused to either share the previous assessment or participate in a new assessment. Respondent requested that DCFS continue investigating L.S.'s allegations and only communicate with her by email.

¶ 50    Ms. Goldmeier and her supervisor attempted to call respondent to discuss respondent's email because they were concerned about L.S.'s safety. After initially answering the call, respondent hung up the phone. She sent another email directing DCFS to only communicate with her by email. At this point, Ms. Goldmeier's supervisor instructed her to go directly to respondent's home to assess L.S.'s safety.

¶ 51    When Ms. Goldmeier arrived at the home, no one was there. Ms. Goldmeier left a voicemail for respondent, who called back and told Ms. Goldmeier that she would be home in about 40 minutes. After waiting about 45 minutes, Ms. Goldmeier called respondent, and upon

receiving no answer, left. Based on the hostility displayed by respondent and her failure to provide DCFS with a mental health assessment, Ms. Goldmeier was concerned for L.S.'s safety.

¶ 52    Respondent later called Ms. Goldmeier's supervisor and reported that she had now arrived at home. The supervisor then informed respondent that due to her failure to complete the mental health assessment, DCFS felt that it was necessary to take protective custody of L.S. Respondent was instructed to turn L.S. over to them. Respondent refused to do so and hung up the phone. DCFS investigators attempted, without success, to take protective custody of L.S. throughout the night. Ms. Goldmeier could not meet with L.S. and assess his safety until after respondent was ordered to turn L.S. over following the temporary custody hearing on December 19, 2019.

¶ 53    In the process of investigating this matter, Ms. Goldmeier spoke with multiple police departments and obtained medical records from St. Mary's Hospital, Erie Family Health Center, and Northwest Community Hospital. She also talked to L.S.'s primary care physician, Dr. Cedeno.

¶ 54    Ms. Goldmeier also spoke with W.S., who disclosed that he was diagnosed with depression and anxiety and participated in individual therapy. W.S. did not show signs of paranoia and was not asked to participate in a mental health assessment. Based on a lack of credible evidence showing that L.S. was sexually abused, DCFS unfounded the sexual abuse allegation against W.S.

¶ 55    All medical records were admitted into evidence.

¶ 56    The records from Erie Family Health showed that on July 19, 2018, respondent and W.S. took L.S. to the office where Dr. Lisa B. McKenna saw him. Respondent was concerned because she had "seen worrisome behavior." She reported seeing L.S. "hump her sister," and "touch her breasts." L.S. had "at times come to her with a very red anus." Both parents denied that L.S. was exposed to sexual activity or pornography.

¶ 57   Respondent reported that she worked three jobs to enable W.S. to stay home with L.S. and "expressed angrily that [W.S.] betrayed her by serving her with papers seeking custody." Respondent reported that she was in therapy. When Dr. McKenna observed that a child's behavioral problems can result from conflict between adult caregivers, respondent replied, "thank you for your opinion, but I came here for an exam. I did not come for therapy with someone who does not know me." Respondent then asked to leave.

¶ 58   W.S. asked Dr. McKenna to record everything she observed that day. Dr. McKenna noted that W.S. said that he did not make any of the observations made by respondent and had no concerns about L.S.'s behavior.

¶ 59   Dr. McKenna observed that "[M]om appeared to anxiously seek to comfort child and offered phone. When dad states he thought child was fine, she angrily retorted that at least she was trying to comfort her child."

¶ 60   L.S. cried during the appointment and asked to go home. A standard physical examination revealed no abnormalities. Dr. McKenna recommended family therapy and parenting classes.

¶ 61   The records from St. Mary's Hospital established that on November 8, 2019, respondent took L.S. to the emergency room based on her concern that L.S. was sexually abused. Respondent told staff at St. Mary's that L.S. awoke in the morning and was very playful. He asked respondent to put her finger in his butt, move it around, make it feel good and to put her finger in his belly button, and move it around to make it feel good. An examination revealed no injuries, rashes, abrasions, or burns.

¶ 62   On November 11, 2019, respondent took L.S. to the emergency room at Northwest Community Hospital. She reported that L.S. had been acting out and bedwetting for several months. Respondent reported that on November 8, 2019, L.S. told her "to put a finger in his butt

to make it feel better." Respondent informed the emergency room nurse that she contacted the police and took L.S. to the emergency room at St. Mary's Hospital. Respondent reported that results of testing conducted at St. Mary's Hospital were negative. Since then, respondent said that L.S. had revealed more information. Respondent was concerned that DCFS was not notified because she had not heard from them. Based on what L.S. told respondent, she believed that W.S. was hurting L.S. Respondent took L.S. to Northwest Community Hospital based on the recommendation of the Arlington Heights Police Department. The results of L.S.'s physical examination was normal.

¶ 63 On November 18, 2019, respondent took L.S. to Erie Health Services for a physical examination. Respondent presented medical staff with a police report containing the report of sexual abuse. In the medical records from this visit, Dr. Cedeno states respondent reported that:

"[L.S.] had been acting out a lot but attributed his behavior to recent moves to September and October from each parent.

He would have nightmares – he has been waking up and bedwetting. He states that the person was his "Dada." Other times, he would be hesitant to disclose who the person is but he would say he looks like the host of Blues Clues, with green eyes and black hair and scruffy beard – who resembles the father.

The child states that the mother does not love him several times, and she believes it's because she won't replicate the father's actions.

Child Advocacy Center conducted the exam and recommended amoxicillin for undisclosed infection. She was not told what the antibiotic is for. She is worried that the impetigo around his mouth that was diagnosed in August may be due to something the father did. He has had breakouts since then, but none today.

She said that she tried to bring him in last week, but the father had taken her off his insurance and she didn't have access to the child's insurance. She said the father also tried to change pediatricians to someone out in Arlington Heights. She has had suspicions about abuse because she would note that the child's anus was always red and did ask father if he touched him, to which he replied no.

She feels that he is scratching his nose a lot. He also has some dryness at the bridge of his nose."

¶ 64 The forensic interview of L.S. conducted on November 19, 2019, was also admitted into evidence.

¶ 65 At the conclusion of the adjudicatory hearing the trial court ruled:

"Thank you. I find that the State has met its burden by a preponderance of the evidence, neglect injurious environment and care necessary. The mother reported that the minor was the victim of sexual abuse or sexual abuse by the father. The Department arranged for a forensic interview of the minor and investigated Mom's allegations in conjunction with the local police. The allegations were unfounded.

Additionally, the mother reported her concerns to three different hospitals where the minor was subjected to but had normal abuse – I'm sorry – normal examinations. The mother persisted in her allegations and would raise her voice, scream at the worker, and police personnel and act in a way described as paranoid, including her belief that the father had cloned her phone and that the father's sister, who was a doctor, might interfere in the minor's treatment and that there were cameras watching her.

She was directed to do a mental health assessment and/or provide the records

of a prior assessment she had. Mother refused to do either. The Department was

reasonably concerned about the safety of the minor.

I find that the Department took the mother's allegations seriously and

professionally followed up and conducted a fair investigation. For those reasons,

the State has met it[s] burden."

¶ 66   Respondent's attorney renewed his request for the court to consider that part of his cross-motion that sought a pre-adjudicatory hearing consideration of whether changed conditions supported a conclusion that no adjudicatory hearing was required. The court denied respondent's motion.

¶ 67   The court then conducted a dispositional hearing. The integrated assessment (IA) conducted by DCFS and completed in May of 2020 was admitted into evidence. In addition to what has previously been recounted, the IA noted that respondent believed that L.S. gained confidence after she obtained an order of protection prohibiting W.S. from having contact with him. Respondent also alleged that L.S. told her that while he was at W.S.'s house he was electrocuted, and people took turns putting things inside his body.

¶ 68   Respondent said that contacting DCFS was the worst mistake she ever made because it led to L.S. being removed from her care and placed in the care of W.S. Respondent was frustrated that DCFS was focusing on her when she and L.S. were both abused by W.S. Respondent reported that W.S. was verbally, physically, and emotionally abusive and had "control issues." W.S. took prescription medication for depression. He isolated respondent from her family and friends. W.S. was "spiteful," having brought false claims of abuse against her that he then relied on in their child custody case.

¶ 69    The IA found that respondent had mental health symptoms that directly impacted her ability to provide care for L.S. The IA noted that respondent was receiving no services to treat her mental health symptoms which resulted in her failing to provide a protective and nurturing parental role and a safe and healthy environment. While respondent had many positive parenting qualities, she lacked the ability to identify aspects of age-appropriate development.

¶ 70    The IA expressed concern that during visits between L.S. and respondent she asked L.S. inappropriate questions. L.S. responded negatively to their visits. During one visit, after asking L.S. questions about stains that she observed on his hands and fingers, she photographed them. The stains were made with markers.

¶ 71    Respondent recounted an incident in which L.S. grabbed her earring and broke it and then said, "My dad has accidents all the time, they happened to me, and he hits my head on accident." Respondent continued to make hotline calls reporting that L.S. was hurt while in W.S.'s care. L.S. continued to deny that he was abused.

¶ 72    The IA stated that the prognosis for L.S. to be returned to respondent's care was "guarded" where she had not identified areas of need for improvement to successfully address L.S.'s needs and lacked insight into the potential impact of her own mental health issues on her parenting. Respondent needed to participate in therapeutic services. Respondent's continued inappropriate questioning of L.S. required therapeutically supervised visits since L.S. demonstrated regression and negative behaviors that could be damaging if allowed to continue.

¶ 73    The clinical screener found that respondent was an articulate mother who expressed her desire for L.S. to be safe and loved. Respondent had a history of anger and irritability and trouble expressing her emotions and coping in appropriate ways. She displayed bizarre and paranoid behavior. Respondent appeared to be unable to safely parent L.S. and placed him at risk because

he could not rely on receiving safe and predictable responses from her. Respondent's lack of proper emotional skills could result in her becoming angry and having impaired decision-making, leading to her making false reports.

¶ 74    The screener recommended that respondent continue to participate in individual therapy and undergo a full-scale psychiatric assessment. It was recommended that respondent participate in the Nurturing Parenting Program (NPP). The screener recommended that respondent continue to have supervised visits with L.S.

¶ 75    The IA also contained an interview with, and observations of W.S. W.S. stated that respondent made an intentional false allegation of sexual assault against him. In March of 2017, W.S. obtained a two-year order of protection against respondent for a violent episode in which respondent threw objects at him. During that episode, respondent became agitated and kicked W.S. while he was holding L.S. W.S., who received a bruised tailbone, went to see a doctor, and reported this incident. A police report indicated that W.S. had received medical treatment for a bruised tailbone and back pain which he reported receiving from respondent. In February of 2019, a default judgment was entered, giving respondent and W.S. shared custody of L.S.

¶ 76    In addition to the IA, the court heard live testimony. DCFS caseworker Carolina Bono testified that on October 8, 2020, she was assigned to this case. Ms. Bono determined that L.S.'s placement with W.S. was safe and appropriate. She observed no signs of abuse or neglect, corporal punishment, or any risk of harm. L.S. had no special needs but participated in individual weekly therapy covered by W.S.'s health insurance policy. L.S. was making progress and doing very well. L.S.'s therapist informed Ms. Bono that L.S. was a very engaging child.

¶ 77    L.S. had an in-person supervised visit with respondent on March 8, 2021. This was her first in-person visit with L.S. since September of 2020. Respondent's visits with L.S. were terminated for a period of time based on her repeatedly questioning him about physical and sexual abuse.

¶ 78    Respondent's inappropriate behavior during visits with L.S. resulted in a determination that respondent required clinically supervised visits. COVID-19 created difficulties in scheduling in-person clinically-supervised visits. In the meantime, respondent's virtual visits with L.S. were increased from once a week to three times a week.

¶ 79    The IA recommended that respondent participate in reunification services, including individual therapy, a psychiatric assessment and treatment, a referral to a DCFS consulting psychologist, a domestic violence assessment, and parenting education and coaching. Respondent was also referred to the National Youth Advocacy Program (NYAP) for individual therapy.

¶ 80    A psychological examination was completed on June 10, 2020. Respondent was found to have an adjustment disorder with a depressed mood. Respondent completed a psychiatric evaluation on November 14, 2020. She was again diagnosed with an adjustment disorder with a depressed mood for which no medication was prescribed.

¶ 81    Respondent consistently attended therapy at NYAP and met her goals. Respondent refused to participate in a domestic violence assessment because she said she was working on these issues with her therapist at NYAP, who was certified in domestic violence. Respondent completed the NPP on December 2, 2020. Respondent was not found to need any additional services.

¶ 82    DCFS recommended that respondent's visits remain supervised. Respondent had complained about some of the terminologies that L.S. was using. L.S.'s therapist verified that his language was appropriate and developmentally on track for a child of his age.

¶ 83    The IA recommended that W.S. continue receiving individual therapy. W.S. also participated in the NPP and completed a domestic violence assessment. According to Ms. Bono, W.S. made a lot of progress. He participated in ongoing therapy and had received psychiatric care for his diagnosis, including being prescribed medication.

¶ 84    Ms. Bono testified that the interactions between W.S. and L.S. were "[v]ery positive, very appropriate. Both the child and the father are very loving. Father is very appropriate in giving the child certain limitations. The kid is not running like crazy all over the house or grabbing things. It's very endearing to see both of them, actually."

¶ 85    Ms. Bono was aware of W.S.'s motion to close the case. She discussed the issue with her supervisor and recommended that the case be closed and L.S. remain in W.S.'s custody. These recommendations were based on DCFS's determination that W.S. was willing, fit, and able to care for L.S., who had been in his custody for over a year, W.S. had a stable home, acted appropriately, continued to participate in individual therapy, and continued to take L.S. to therapy. There was no indication that L.S. was abused or neglected by his father. W.S. ensured that he would continue to bring L.S. for clinically supervised visits with respondent if the case was closed.

¶ 86    A letter from Michael Altobelli, W.S.'s licensed professional therapist, was also admitted in evidence. It indicated that W.S. was his patient since September 11, 2019 and was achieving his goals. W.S. implemented DCFS's recommendation that L.S. receive individual therapy. That therapy included a child/parent counseling aspect directed to improving the father/son relationship. Through therapy, W.S. learned the skills to successfully attend to L.S.'s developmental needs.

¶ 87    A Partner Abuse Intervention Program (PAIP) evaluation found that W.S. required no additional services.

¶ 88     At the conclusion of the hearing, the State asked the court to adjudge L.S. a ward of the court, find respondent unable to care for L.S., and find W.S. fit, able, and willing to care for L.S. The Public Guardian requested that L.S. be ordered to remain in the care and custody of W.S. and asked that the matter be closed. W.S.'s request mirrored that of the Public Guardian. Respondent's attorney asked that the court find respondent fit, willing, and able to care for L.S.

¶ 89     The court made the following findings:

> "Okay. The Court finds that it is in the best interests of the minor that he be adjudged a ward of the Court. I find that the mother is unable only and that the father is fit, willing, and able. The mother thus far has had only one clinically supervised visit, and the testimony is that the allegations that brought the case in still persist.
>
> The Father has completed all of his services. He was engaged and completed services and he ensures that his son continues in therapy. There is a mediation agreement in place that covers visitation issues.[6]
>
> The minor shall remain in the care and custody of the father. I vacate the guardian *ad litemship* and close this matter."

¶ 90     Respondent asked the court to stay the proceeding pending a motion to reconsider. The court stated that respondent could file a motion to reconsider but refused to stay the proceedings. Respondent made an oral motion for the court to reconsider his previously denied cross-motion. The court denied the motion.

---

[6]A "Memorandum of Agreement" dated March 3, 2021, sets out the agreed-upon terms of respondent's visitation with L.S.

¶ 91 On April 7, 2021, respondent filed a "Motion to Reconsider this Court's March 11, 2021, Refusal to Hear Mother's Motion to Dismiss, and this Court's Adjudication and Dispositional Findings." On June 11, 2021, the parties appeared before the trial court on respondent's motion. At that time, she filed a more expansive version of her motion to reconsider. The second filing was first served on the parties and the court that day.

¶ 92 The parties were given leave to argue their respective positions.

¶ 93 In denying respondent's motion, the trial court made the following findings:

"I'm ready to rule. First, we already ruled and denied the Mother's motion to reconsider. I'm not considering that today.

With respect to the motion to reconsider the adjudicatory findings, the Court made specific factual findings in totality to support the adjudicatory ruling, and I invite the reviewing court, if this is filed, to review same. The motion to reconsider those findings is denied.

I'm also striking the amended motion filed this a.m. I'm told it is over 100 pages. I have obviously not reviewed it. I just did a check of my email, I did not even receive it, but I have considered Counsel's arguments that were raised today. For those reasons, that is the Court's ruling. Thank you."

¶ 94                                    II. ANALYSIS

¶ 95 On appeal, respondent raises two issues. First, respondent alleges that the petition for adjudication of wardship failed to state a cause of action. Respondent maintains that the trial court erred where it refused to consider her section 2-615 motion to dismiss based on it being untimely filed. Alternatively, respondent argues that she was denied the effective assistance of counsel where a timely filed motion would have been meritorious.

¶ 96 Respondent also alleges that she was denied her statutory right to be present at the adjudicatory and dispositional hearings in this matter where they were conducted by audio-video conference, using an internet-based video-conference platform, Zoom Video Communications (Zoom).

¶ 97 For the reasons that follow, we affirm the findings of the trial court.

¶ 98 A. Whether the Petition for Adjudication of Wardship Stated a Cause of Action

¶ 99 1. Standard of Review

¶ 100 Other than delinquency proceedings where the liberty of a minor is at stake, proceedings under the Act are governed by the general rules of civil practice as expressed in the provisions of the Code of Civil Procedure (Code) (735 ILCS 5/1-101 *et seq.* (West 2020)); *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 26. Under section 2-615 of the Code, the sufficiency of the petition may be challenged by filing a motion to dismiss. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 14. "The critical inquiry in deciding a section 2-615 motion to dismiss is whether the allegations in the complaint, considered in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 61.

¶ 101 A petitioner need not prove his case at the pleading stage but must allege sufficient facts to state all the elements of the cause of action. *Seals v. Rush University Medical Center*, 2021 IL App (1st) 200558, ¶ 11. In ruling on a motion to dismiss, the trial court considers only those facts apparent from the face of the pleadings, matters of which the court may take judicial notice and judicial admissions in the record. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). A motion to dismiss should only be granted if there is no set of facts that can be proven

under which the plaintiff is entitled to relief. *Kaskaskia Land Company, LLC v. Vandalia Levee and Drainage District*, 2019 IL App (5th) 180403, ¶ 19.

¶ 102   Issues relating to the sufficiency of pleadings raise questions of law and are reviewed *de novo*. *Pekin Ins. v. Wilson*, 237 Ill. 2d 446, 455 (2010); *In re Kenneth J.*, 352 Ill. App. 3d 967, 973 (2004). A dismissal order may be affirmed for any basis in law or ground appearing in the record regardless of whether the reasons given by the trial court or its findings are correct or sound. *Motorola Solutions, Inc. v. Zurich Ins. Co.*, 2015 IL App (1st) 131529, ¶ 104; *Dratewska-Zator v. Rutherford*, 2013 IL App (1st) 122699, ¶16. With these general principles in place, we now consider whether the trial court's refusal to consider respondent's claim that the petition for adjudication of wardship failed to state a claim was in error.

¶ 103                                    2. Relevant Facts

¶ 104   We begin with a brief discussion of the relevant facts. Respondent filed what she titled a "Memorandum in Support of Father's Motion to Vacate the 2-25 Order of Protection and Cross-Motion to Dismiss." "The nature of a motion is determined by its substance rather than its caption." *Shutkas Elec. Inc. v. Ford Motor Co.*, 366 Ill. App. 3d 76, 81 (2006) (quoting *J.D. Marshall International, Inc. v. First National Bank of Chicago*, 272 Ill. App. 3d 883, 888 (1995)). Strictly speaking, respondent's motion was not a "cross-motion" where W.S. was not seeking a pre-adjudicatory dismissal of the petition. Rather, W.S.'s position was wholly antagonistic to that of respondent, where he maintained that L.S. should be adjudged neglected based on respondent's actions. W.S.'s motion was filed in anticipation of a dispositional hearing that presupposed a finding of neglect. Put differently, W.S.'s motion sought a post-adjudicatory, post-dispositional closing of this case.

¶ 105   On the other hand, respondent sought to use W.S.'s motion as a springboard to seek a pre-adjudicatory dismissal of the petition for adjudication of wardship on three distinct grounds. Respondent's primary argument was that the court's decision in *Z.L.* supported a pre-adjudicatory dismissal of the petition based on "evidence" obtained after the temporary custody hearings. Alternatively, respondent maintained the petition for adjudication of wardship should be dismissed for failing to state a cause of action under section 2-615 or based on a defect or defense under section 2-619.

¶ 106   W.S. objected to respondent's request for a pre-adjudicatory hearing on her motion where the parties were ready for trial and where respondent never served him with a copy of her supplemental motion. The supplemental motion maintained that respondent's cross-motion was not untimely based on Cook County Circuit Court Rule 2.1.[7] Alternatively, the supplemental motion alleged that if the trial court determined that the cross-motion was untimely, that respondent was deprived of the effective assistance of counsel where the motion was meritorious.

¶ 107   The trial court found that respondent had not served W.S. with a copy of the supplemental motion and found respondent's cross-motion "wasn't timely filed."

¶ 108                               3. Timeliness

¶ 109   Respondent no longer relies on local rule 2.1(a) to support her claim that the trial court erred when it refused to consider her cross-motion, but on the absence of a time limitation in section 2-615 for the bringing of a motion to dismiss, as well as on the general rule that the

_____

[7]Cook County Circuit Court Rule 2.1(a) provides: "Except in actions appearing on the daily trial call or during the course of trial, written notice of the hearing of all motions shall be given to all parties who have appeared and have not theretofore been found by the court to be in default for failure to plead, and to all parties whose time to appear has not expired on the date of notice. Notice that additional relief has been sought shall be given in accordance with Supreme Court Rule 105." (Amended August 21, 2000.)

sufficiency of a complaint may be challenged at any time if it appears that it absolutely fails to state a cause of action that the law will recognize. *People v. Vincent*, 226 Ill. 2d 1, 8-9 (2007).

¶ 110    The State correctly argues that the filing requirements for a motion challenging a pleading in an abuse and neglect case are circumscribed by local rule. Cook County Circuit Court Rule 19A.2(B) requires that:

> "An answer or motion with respect to pleadings must be filed within twenty-one (21) days after the filing of the petition or the Rule 19A.1 Section B supplemental petition whichever is later. Upon motion and a showing of good cause the court may extend the time for filing." (Adopted December 31, 1992, effective January 4, 1993).

¶ 111    Illinois Supreme Court Rule 21(a) (eff. Jan. 1, 2021) provides that "a majority of the circuit judges in each circuit may adopt rules governing civil and criminal cases which are consistent with these rules and the statutes of the State, and which, so far as practicable, shall be uniform throughout the State." "The [circuit] court may, from time to time, make all such rules for the orderly disposition of business before them as may be deemed expedient, consistent with law." 705 ILCS 35/28 (West 2020). In addition, under section 5/1-104(b) of the Code (735 ILCS 5/1-104(b) (West 2020)), circuit courts possess inherent authority to make rules regulating their dockets, calendars, and business, so long as those rules do not conflict with statutes or Supreme Court Rules. *In re Marriage of Jackson*, 259 Ill. App. 3d 538, 543 (1994). Local court rules are required to be procedural in nature and cannot modify or limit the substantive law. *Leonard C. Arnold, Ltd. v. Northern Trust Co.*, 116 Ill. 2d 157, 167 (1987).

¶ 112    A local court rule has the force of a statute and is binding on the circuit court and parties. *Jones v. State Farm Mutual Automobile Insurance Company*, 2018 IL App (1st) 170710, ¶ 21.

"Like supreme court rules, local court rules are meant to be followed, as written, and are not mere suggestions or guidelines from which deviations may be made by the litigants." *VC & M Ltd. v. Andrews*, 2013 IL 114445, ¶ 26. The trial court has the inherent authority to control matters before it as necessary to prevent undue delay or disruption in the proceedings. *Id.*

¶ 113   Here, the provisions of local rule 19A apply exclusively to abuse, neglect and dependency proceedings. Rule 19A.2(B) assists in implementing the overriding purpose of the Act to ensure the " 'safety and moral, emotional, mental, and physical welfare' of minors and the best interest of the community." *In re Madison H.*, 215 Ill. 2d 364, 373 (2005) (citing *In re C.N.*, 196 Ill. 2d 181, 209 (2001); 705 ILCS 405/1-2 (West 2018)). The need for these sensitive matters to be handled in an expeditious fashion goes beyond the requirements of the Act and local rule 19A and is further reflected in Illinois Supreme Court Rule 311 (eff. July 1, 2018), which mandates accelerated treatment of appeals in cases involving final orders in child custody or allocation of parental responsibilities cases.

¶ 114   We agree with the State that the trial court's refusal to consider respondent's cross-motion where it "wasn't timely filed" was entirely consonant with local rule 19A.2(B), where respondent sought dismissal of the petition for adjudication of wardship more than a year after it was filed. Respondent neither acknowledged the applicability of the rule nor sought leave to file a motion showing good cause for filing her motion to dismiss beyond the 21-day filing deadline.

¶ 115   Respondent's violation of local rule 19.A.2(B) was not an inconsequential matter. Respondent's delay was wholly unjustified given everything that occurred between the date the petition was filed, December 19, 2019, and the pre-set date for the adjudicatory and dispositional hearings, March 11, 2021. By March 11, 2021, the parties had appeared in court on numerous occasions, including the two temporary custody hearing dates when sworn testimony concerning

the underlying basis of the allegations outlined in the petition was given. The trial court properly refused to consider respondent's untimely motion.

¶ 116                              4. Ineffective Assistance of Counsel

¶ 117   Next, we consider respondent's alternative claim that her attorney's failure to file a timely motion to dismiss the petition for adjudication of wardship denied her the effective assistance of counsel. We agree with the State, the Public Guardian, and W.S. that respondent was not denied the effective assistance of counsel.

¶ 118   Although there is no constitutional right to counsel in abuse and neglect proceedings, a statutory right to counsel is granted under the Act. *In re Br. M.*, 2021 IL 125969, ¶ 41. Specifically, section 1-5(1) of the Act provides:

> "[T]he minor who is the subject of the proceeding and his parents \*\*\*
> have the right to be present, to be heard, to present evidence material to the
> proceedings, to cross-examine witnesses, to examine pertinent court files and
> records and also, although proceedings under this Act are not intended to be
> adversary in character, the right to be represented by counsel." 705 ILCS
> 405/1-5(1) (West 2018).

¶ 119   Claims of ineffective assistance of counsel in parental rights proceedings are assessed using the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *Br. M.*, 2021 IL 125969, ¶ 43. As such, respondent must show that trial counsel rendered substandard representation and that respondent suffered resulting prejudice from the deficient representation. *Id.* If an ineffective assistance of counsel claim can be disposed of by finding a lack of prejudice, the court need not consider whether counsel's performance was deficient. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 36.

¶ 120   Here, we find that respondent is unable to demonstrate that trial counsel's failure to file a timely motion to dismiss prejudiced her where such motion would have been futile. We now consider the substance of the allegations contained in the petition for adjudication of wardship.

¶ 121                              5. The Petition Stated a Cause of Action

¶ 122   A section 2-615 motion to dismiss challenges the legal sufficiency of a complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). "The essential test of the sufficiency of the complaint is whether it reasonably informs the defendant of a valid claim under a general class of cases of which the court has jurisdiction." *In re Harpman*, 146 Ill. App. 3d 504, 512 (1986) (quoting *Skinner v. Mahomet Seymour School District No. 3*, 90 Ill. App. 3d 655, 656-57 (1980)). An action should not be dismissed on the pleadings unless it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. *Marshall*, 222 Ill. 2d at 429. In ruling on the motion, the court must accept as true all well-pleaded facts in the complaint as well as any reasonable inferences that may arise from them. *Maglio v. Advocate Health and Hospitals Corp.*, 2015 IL App (2d) 140782, ¶ 19. All surplusage and conclusory allegations are to be disregarded. *Indian Harbor Ins. Co. v. City of Waukegan*, 2015 IL App (2d) 140293, ¶ 12.

¶ 123   In an abuse and neglect petition, the State must allege that the minor is abused, neglected, or dependent and, *inter alia*, set forth any factual allegations that form the basis for filing the petition. 705 ILCS 405/2-13(2) (West 2018). In this case, the petition for adjudication of wardship alleged that L.S. was a neglected or abused minor under sections 2-3(1)(a) and (b) and 2-3(2)(ii) of the Act.

¶ 124    Section 2-3(1)(a) and (b) provide:

"(1) Those who are neglected include:

(a) any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parent or parents or other person or persons responsible for the minor's welfare, except that a minor shall not be considered neglected for the sole reason that the minor's parent or parents or other person or persons responsible for the minor's welfare have left the minor in the care of an adult relative for any period of time, who the parent or parents or other person responsible for the minor's welfare know is both a mentally capable adult relative and physically capable adult relative, as defined by this Act; or

(b) any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday whose environment is injurious to his or her welfare ***." 705 ILCS 405/2-3(1)(a), (b) (West 2018).

¶ 125   In pertinent part section 2-3(2)(ii) provides:

"(2) Those who are abused include any minor under 18 years of age or a minor 18 years of age or older for whom the court has made a finding of probable cause to believe that the minor is abused, neglected, or dependent under subsection (1) of Section 2-10 prior to the minor's 18th birthday whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018).

¶ 126   The factual allegations that formed the basis for the State's claims were that:

"Mother has made multiple allegations of sexual and physical abuse against father and numerous paternal relatives. The minor has been evaluated numerous times by medical professionals with no corroboration of mother's allegations. Minor has never reported that he has been abused. Mother is the only person who states that minor says he has been abused. Domestic Relations Court has suspended father's visits pending DCFS investigation. Mother has made numerous unusual outbursts in court, doctor's office and DCFS office. Mother had to be removed from the CAC by Chicago Police during one outburst. DCFS has requested mother do a

psychiatric examination and mother has refused. Mother is not allowing access to minor. Paternity has been established."

¶ 127 The State, the Public Guardian, and W.S. maintain that the petition sufficiently stated a cause of action for neglect. We agree.

¶ 128 "Neglect" is the failure to exercise the level of care that is demanded by the circumstances. *In re M.D.*, 2021 IL App (1st) 210595, ¶ 24; *In re K.B.*, 2012 IL App (3d) 110655, ¶ 16. The term "neglect" has a fluid meaning that includes willful and intentional disregard of duty and varies based on the context of surrounding circumstances. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 129 The concept of an "injurious environment" varies with the circumstances and includes a breach of a parent's duty to provide a safe and nurturing shelter for their child. *Id.*; *In re L.M.*, 319 Ill. App. 3d 865, 868 (2001); *In re John Paul J.*, 343 Ill. App. 3d 865, 879 (2003).

¶ 130 Here, the substance of the petition for adjudication of wardship alleged that respondent's unfounded sexual abuse allegations subjected L.S. to repeated evaluations by medical professionals and resulted in the entry of an order of protection that denied L.S. contact with W.S. In the course of DCFS investigating respondent's charges, she made multiple unusual outbursts to a variety of people that caused DCFS to request that she be examined by a mental health expert. Respondent refused the request. Critically, the petition also alleged that respondent denied DCFS access to L.S.

¶ 131 In keeping with our duty to liberally construe the allegations contained in the petition for adjudication of wardship and draw all reasonable inferences in the light most favorable to the State, *Parente & Norem, P.C. v. Chicago Regional Council of Carpenters Welfare Fund*, 2021 IL App (1st) 200340, ¶ 20, we consider the petition's allegations *in toto*. The allegations were clearly sufficient to state a cause of action for neglect.

¶ 132 Respondent objects to the Public Guardian's claim that "the petition as a whole obviously sets forth a fact pattern showing that [respondent] was either fabricating the sex abuse allegations or was mentally ill and deluded and believed that [L.S.] had been sexually abused, even after [L.S.] denied any abuse." Respondent's objection is not well taken where it disregards the requirement that both the facts as set forth in the petition and the *reasonable inferences* that may arise from those facts are properly considered in deciding the sufficiency of the cause of action. *Maglio*, 2015 IL App (2d) 140782, ¶ 19. The Public Guardian's characterization of the substance of the allegations made in the petition is based on reasonable inferences that directly undercut respondent's claim that the petition failed to state a cause of action.

¶ 133 Respondent also criticizes both the State and the Public Guardian for failing to provide legal authority that would make respondent's "conduct, behavior, action, inaction, or omission" legally sufficient to state a claim of neglect or abuse as charged. Respondent's criticism ignores the fact that, as our supreme court has instructed, these matters are *sui generis* and must be decided based on their unique facts. *Arthur H.*, 212 Ill. 2d at 463. The nature of these cases is such that no two cases will ever present an identical factual scenario.

¶ 134 Next, we reject respondent's reliance on *In re Harpman*, 134 Ill. App. 3d 393, 396 (1985). *Harpman* does not support respondent's position where it is inapposite. Unlike this case, in *Harpman*, the respondent was charged with neglecting the minor based on a prior version of the Act that did not permit a charge of neglect to be based on an "injurious environment." *Id.* at 396. Unlike the version of the Act in effect in this case, an "injurious environment" could only be relied on as a basis for alleging that a minor was abused. *Id.* Therefore, as a matter of law, the petition failed to state a cause of action. *Id.*

¶ 135   *Harpman* does not stand for the proposition that a charge of neglect may not be predicated on a parent's failure to obtain therapeutic services in appropriate circumstances. Again, we note that our rejection of respondent's claim that the petition failed to state a cause of action is based on the totality of the allegations contained therein. Viewed as a whole, the allegations stated a proper cause of action.

¶ 136   As a final matter, we note that respondent's claim of ineffective assistance of counsel is also undermined by the fact that had trial counsel interposed a timely objection to the sufficiency of the petition, that the State would have been able to cure any alleged infirmity by amending the petition. The Act provides:

> "The court shall liberally allow the petitioner to amend the petition to set forth a cause of action or to add, amend, or supplement factual allegations that form the basis for a cause of action up until 14 days before the adjudicatory hearing. The petitioner may amend the petition after that date and prior to the adjudicatory hearing if the court grants leave to amend upon a showing of good cause. The court may allow amendment of the petition to conform with the evidence at any time prior to ruling. In all cases in which the court has granted leave to amend based on new evidence or new allegations, the court shall permit the respondent an adequate opportunity to prepare a defense to the amended petition." 705 ILCS 405/2-13(5) (West 2020).

¶ 137   Indeed, it is the long-standing public policy in Illinois that the rights of minors are to be guarded carefully. *In re Tyrese J.*, 376 Ill. App. 3d 689, 703 (2007). In *Tyrese J.*, the court found that the trial court erred in disallowing the State from amending its pleadings to conform to the evidence, although the State's motion was untimely, and the State provided no good explanation

for waiting until the close of the evidence to seek leave to amend the petition. *Id*. at 702. Nevertheless, the court determined that the trial court had an obligation to intervene when the minor's representative failed to protect his interests and either allow the State to correct the mistake or amend the petition *sua sponte*. *Id*. at 704. Such action was called for to protect the minor's interests and harmonize with the purpose of the Act. *Id*.

¶ 138  We have set forth a highly detailed recitation of the evidence adduced at the various stages of the litigation in this case because it informs our conclusion that respondent was not denied the effective assistance of counsel. Had counsel interposed a timely objection to the sufficiency of the petition the State would have had ample basis to amend the petition to reflect the additional evidence amassed by DCFS in the course of their investigation of this matter. Moreover, under the express terms of section 2-13(5) of the Act, if the State moved to amend the petition within 14 days of the adjudicatory hearing, the trial court would have been required to allow the amendment. Put differently, we do not believe that trial counsel was ineffective for failing to file a timely motion or that respondent was prejudiced by counsel's failure to do so.

¶ 139  In conclusion, we find that the trial court properly declined to consider the substance of respondent's section 2-615 motion to dismiss, and that respondent was not denied the effective assistance of counsel based on trial counsel's failure to timely file the motion.

¶ 140        B. Whether Respondent's Statutory Right of Presence Was Violated

Where the Adjudicatory and Dispositional Hearings Were

Conducted By Audio-Video Conference

¶ 141  Respondent also alleges that she was denied her statutory right of presence under section 1-5(1) of the Act, where the adjudicatory and dispositional hearings were conducted by audio-video conference, using an internet-based video-conference platform, Zoom. The State, the Public

Guardian, and W.S. maintain that conducting the hearings in this manner did not violate respondent's right of presence.

¶ 142   For the following reasons, we affirm the trial court's ruling.

¶ 143                              1. Trial Court's Factual Findings

¶ 144   In denying respondent's "Objection to Conducting the Adjudicatory Hearing by Videoconference," on November 17, 2020, the trial court made the following express findings of fact:

> "Thank you. All right. Again, we are in an unprecedented time. The deadly virus has spread worldwide. Yesterday, there were over 3,000 deaths [in] one day in the United States, the highest daily death toll ever.
>
> In Cook County alone, over 335,000 people have been infected. And over 6,500 people have died, and many others are hospitalized.
>
> In the Circuit Court of Cook County, as of yesterday, 211 employees and 17 judges working under the auspices of the Chief Judge have contracted the virus.
>
> And I should also mention that the bulk of those employees are people who work in the juvenile court complex. That number is not inclusive of the others we come in contact with on a daily basis, like the Clerk of the Circuit Court, the Sheriff's office, and the Department of Children and Family Services, amongst others.
>
> The Illinois Supreme Court issued a policy on remote court appearances in civil proceedings effective May of 2020. In it, the Supreme Court recognized that meaningful access to court is essential to ensuring the integrity and fairness of the

judicial process. It recognized remote appearances as beneficial, specifically with respect to our courts.

The Policy states it will allow participants such as caseworkers, witnesses, and experts a more efficient way to provide testimony and reduce costs, provide caseworkers and treatment providers with time-saving measures which allow them to better manage their other duties and cases.

In its order of October 27, 2020, the Court stated Illinois has been in a state of emergency since Governor Pritzker's declaration on March 9, 2020, due to the COVID-19 pandemic necessitating temporary court-imposed restrictions to minimize the impact of COVID-19 on the court system.

In light of these trying times, the Chief Judge of the Circuit Court of Cook County in his latest order of November 23, 2020, stated that except in extraordinary and compelling circumstances, all matters shall be conducted by video conference. All judges and employees of the Court shall work remotely and conduct business telephonically.

In the instant case, the petition alleges the mother made multiple allegations of sexual and physical abuse against the father and other paternal relatives.

The minor was allegedly examined on multiple occasions, and mother's allegations could not be corroborated. The Court, after a full hearing, sent the minor home under an Order of Protection to live with his father.

The mother raises other concerns regarding the Court's ability to judge credibility. Prior to the pandemic, witnesses were allowed to testify via video, and this Court has been able to make clear credibility determinations.

The Court has a balancing act to perform. We are mandated to do what is in the best interest of the child, and to balance that against the fundamental rights of the parent.

The harm is not in proceeding by way of video conference. The harm is in allowing a child to remain in limbo when he could be permanently returned home or achieve another level of permanency.

In order to ensure all matters are handled in accordance with the guidelines and to address some of the concerns raised by the parent, the Court will ensure that the party has access to a computer in the room where his counselor can safely confer.

The parties shall meet and confer on all exhibits seven days prior to the trial, shall mark and provide all agreed upon [exhibits] to the Court five days prior to trial.

The Court shall identify each person in the room for a hearing and not allow any unauthorized persons access. The parties shall inform all witnesses that they should testify in private, that they are not to review any documents or other notes unless authorized – while testifying, unless authorized by the Court. And they are not to confer with anyone on the pending matter.

This Court will admonish each witness of same prior the start of their testimony.

This Court will not unnecessarily expose parties to the already deadly virus. Mother's motion is therefore denied."

¶ 145                                    2. Legal Analysis

¶ 146   Section 1-5(1) of the Act provides:

> "[T]he minor who is the subject of the proceeding and [their] parents ***
>
> have the right to be present, to be heard, to present evidence material to the
>
> proceedings, to cross-examine witnesses, to examine pertinent court files and
>
> records, and *** to be represented by counsel." 705 ILCS 405/1-5(1) (West 2020).

¶ 147   The respondent's rights under section 1-5(1) are not, however, absolute. *In re M.R.*, 316 Ill. App. 3d 399, 402 (2000).

¶ 148   We review questions of statutory compliance *de novo*. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 24. In the context of a due process challenge, this court held that whether the trial court's procedures in conducting a termination hearing by audio-video conference violated respondent's constitutional rights is reviewed *de novo* in *In re R.L.*, 2021 IL App (1st) 210419, ¶ 10.

¶ 149   Illinois Supreme Court Rule 241 (eff. May 22, 2020) provides:

> "The court may, upon request or on its own order, for good cause shown
>
> and upon appropriate safeguards, allow a case participant to testify or otherwise
>
> participate in a civil trial or evidentiary hearing by video conferencing from a
>
> remote location."

¶ 150   The committee comments to Rule 241 (rev. May 22, 2020) provide that the court:

> "should take into consideration and balance any due process concerns, the
>
> ability to question witnesses, hardships that would prevent the case participant from
>
> appearing in person, the type of case, any prejudice to the parties if testimony
>
> occurred by video conference, and any other issues of fairness."

¶ 151   Here, the trial court's express findings of fact appropriately balanced respondent's request for an in-person hearing against the harsh realities facing Cook County as a result of COVID-19. The trial court made factual findings supporting its ruling and put measures in place to reduce the potential difficulties that could arise from proceeding remotely. Respondent's right of presence was not violated.

¶ 152   Our conclusion finds direct support in *In re P.S.*, 2021 IL App (5th) 210027 and *In re Aa.C.*, 2021 IL App (1st) 210639, both which rejected similar challenges to the trial court conducting remote hearings by audio-video conferences.

¶ 153   In *P.S.*, the respondent father objected to the termination hearing being conducted by video conference *via* Zoom. *P.S.*, 2021 IL App (5th) 210027, ¶ 46. The trial court denied the respondent's request for a continuance until an in-person hearing could be conducted. *Id.*

¶ 154   On appeal, the respondent claimed that the trial court denied him his right to an in-person hearing and violated his due process right to appear personally at all stages of the proceedings. *Id.* ¶ 51. In assessing the respondent's claim, the court began by recognizing that the respondent had a fundamental liberty interest, protected by the due process clause of the fourteenth amendment, in maintaining his relationship with his child. *Id.* ¶ 52. In a proceeding to terminate parental rights, the parent's rights included the right to be present, be heard, present evidence material to the proceedings, and cross-examine witnesses.

¶ 155   After engaging in a detailed discussion of Rule 241 and the committee comments that follow, the court rejected the respondent's due process and statutory challenges to the manner in which the termination hearing was conducted. As is relevant to the claim raised in this appeal, the court specifically rejected the respondent's claim that section 1-5(1) of the Act provides a parent a statutory right to demand an in-person hearing during termination proceedings. *Id.* ¶ 73. The

court noted that "[w]hile Rule 241 does not specifically state that remote participation is the same as the statutory right to be 'present' at a hearing, such a finding is implicit in the Rule's provision allowing persons to 'participate' remotely." *Id*.

¶ 156   The court additionally found that the trial court conducted the remote hearing in a manner that safeguarded the integrity of the proceeding and the parties' rights. *Id*. ¶ 60. The court concluded that the respondent's right of presence was adequately protected where he was able to testify and be heard, present evidence, and cross-examine witnesses. *Id*. ¶ 63.

¶ 157   In *Aa.C.*, the respondent objected to the trial court conducting a hearing to terminate his parental rights by video conference and moved to continue the proceeding until the hearing could be held in person. *Aa.C.*, 2021 IL App (1st) 210639, ¶ 5. The trial court denied the respondent's request; however, it reserved the right to continue the case mid-hearing for further in-person proceedings, should the facts warrant such a course of action. *Id*. ¶ 6. At the conclusion of the hearing, the respondent was found unfit to parent her children and her parental rights were ultimately terminated. *Id. ¶¶* 7-8.

¶ 158   On appeal, the court considered the respondent's claims that the remote hearing violated her statutory right to be physically present at the trial and her due process rights. *Id*. ¶ 12. The court first rejected the respondent's due process challenge, finding that the government's interest in keeping the population safe and the procedural safeguards set in place by the trial outweighed any minimal risk created by conducting the trial remotely. *Id*. ¶ 15.

¶ 159   Next, the court addressed the respondent's contention that her statutory rights under section 1-5(1) were violated by conducting the trial remotely. *Id.* The court noted that where the right of presence is not absolute even at a critical stage in a criminal proceeding that "[i]t naturally follows that the same is true for termination of parental rights proceedings." *Id*. ¶ 17. The court relied on

the reasoning in *P.S.* to find that the respondent's right of presence was not violated by conducting her trial via Zoom. *Id.* ¶ 16.

¶ 160   While respondent's claim is solely based on a violation of section 1-5(1), we further note that this court also rejected challenges to the use of remotely-conducted audio-video conferences on due process grounds in *In re R.L.*, 2021 IL App (1st) 210419, ¶ 13 and *In re R.D.*, 2021 IL App (1st) 201411, ¶ 21.

¶ 161   We adopt the reasoning utilized in the prior decisions of this court in finding that respondent's statutory right of presence was not violated. Respondent's right to be present, to be heard, to present evidence, to cross-examine witnesses, to examine pertinent court files, and to be represented by counsel were fully protected in this case. In other words, the full panoply of rights guaranteed by section 1-5(1) were adequately safeguarded at respondent's adjudicatory and dispositional hearings.

¶ 162                                    III. CONCLUSION

¶ 163   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 164   Affirmed.