2025 IL App (1st) 242532-U

No. 1-24-2532

Order filed June 13, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* M.W., J.D. and S.D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 22 JA 802 |
| Petitioner-Appellee, | ) | 22 JA 803 |
| | ) | 22 JA 804 |
| v. | ) | |
| | ) | Honorable |
| Yvonne W., | ) | Robert Balanoff |
| | ) | Andrea M. Buford, |
| Respondent-Appellant). | ) | Judges Presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's finding that the minors were neglected and abused where the findings are not against the manifest weight of the evidence and the State's allegations sufficiently stated such claims. Respondent's challenge to the State being allowed to amend its petitions for the adjudication of wardship is invited error and her challenge to the minors' temporary custody is moot.

¶ 2     Following the State filing petitions for the adjudication of wardship on behalf of minors, M.W., J.D. and S.D., based on theories of neglect and abuse, the trial court granted temporary custody of them to the guardianship administrator of the Department of Children and Family Services (DCFS). As the proceedings ensued, the State sought leave to amend its petitions. After the attorney of respondent, Yvonne W., stated that she had no objection to the amendments, the trial court allowed the State to amend its petitions. No modifications were made to the temporary custody order still in effect. The case proceeded to an adjudicatory hearing, where the court found the minors neglected due to an injurious environment and abused due to the substantial risk of physical injury, and to a dispositional hearing, where the court found that respondent was unable to care for, protect, train or discipline the minors. Respondent now appeals and contends that: (1) the court should have denied the State's request to amend its petitions; (2) the court should have vacated the temporary custody order after the State changed the factual allegations supporting its theories of abuse and neglect through the amended petitions; (3) she received ineffective assistance of counsel where none of her attorneys moved to vacate the temporary custody order; and (4) the State failed to allege and prove that M.W., J.D. and S.D. were neglected or abused. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                          A. Preliminary Proceedings

¶ 5     Respondent gave birth to M.W. in July 2022, J.D. in February 2018 and S.D. in August 2015. Tawon T. is the father of M.W. and J.D., and Steven D. is the father of S.D. Neither father is a party to this appeal.

¶ 6     On October 28, 2022, the State filed petitions for the adjudication of wardship on behalf of M.W., J.D. and S.D. The petition filed on behalf of M.W. alleged that he was neglected due to an

injurious environment, abused due to the infliction of physical injury and abused due to the substantial risk of physical injury. For all three theories, the State asserted that respondent reported M.W. fell off her chest and onto the floor yet medical professionals diagnosed him with blood in the brain that occurred prior to the date reported by respondent. As such, medical professionals believed that respondent's report was inconsistent with M.W.'s injury. The State noted that respondent was uncooperative with medical personnel and DCFS, and she had one prior indicated report with DCFS for neglect due to an injurious environment and abuse due to substantial risk of physical injury. In the State's petitions on behalf of J.D. and S.D., it asserted the same factual allegations and claimed that they were neglected due to an injurious environment and abused due to the substantial risk of physical injury. The State also sought temporary custody of the minors, in part, due to probable cause they were neglected and abused.

¶ 7     The trial court appointed an attorney for respondent and held a temporary custody hearing, where Tiara Long, a DCFS investigator, testified about the State's allegations. In particular, Long testified that respondent reported that M.W. fell off her lap, resulting in them going to the emergency room of Comer Children's Hospital. M.W. underwent a CT scan, which initially came back as normal. However, a second read of the scan revealed a fractured skull and bleeding in the brain. Because M.W. had been discharged after the first read of the CT scan, the hospital called respondent and demanded she return with M.W., otherwise it would call DCFS. Instead of returning to Comer Children's Hospital, respondent took M.W. to Lurie Children's Hospital for a second opinion, where a CT scan revealed "old blood" in the brain, but no fracture. Based on the imaging, Dr. Norell Rosado, a child abuse pediatric specialist at Lurie's, did not believe M.W.'s injury was consistent with respondent's story. Doctors at Lurie's wanted to do additional imaging of M.W.'s brain, but respondent left the hospital with M.W. before he could undergo additional

testing. Given the circumstances, Long took protective custody of J.D. and S.D. and placed them with respondent's sister. Long attempted to take protective custody of M.W. from respondent's residence, but she was unable to do so and left the residence fearing for her safety.

¶ 8 After the testimony and argument, the trial court noted its concern that M.W.'s injury was inconsistent with respondent's story and found probable cause in the State's allegations. The court accordingly concluded it was in the best interests of M.W., J.D. and S.D. to be removed from respondent's home and placed in temporary custody with the guardianship administrator of DCFS.

¶ 9 As the case proceeded, multiple attorneys of respondent's requested leave to withdraw or to have their appointments vacated due to irreconcilable differences with respondent. The parties also had a mediation, where M.W.'s aunt, his care provider, reported that he no longer needed an MRI. Because respondent had multiple attorneys representing her at various times and the vast amount of discovery, the parties, including respondent, agreed to waive the 90-day time limit for the adjudicatory hearing. Eventually, the adjudicatory hearing was scheduled for mid-March 2024.

¶ 10 Approximately a week before the hearing, respondent filed a motion to postpone it noting that her fourth court-appointed attorney needed more time to prepare a defense. Respondent asserted that, based on the medical records, M.W. might have been born with a birth condition known as "BESS," benign enlargement of subarachnoid spaces, which could have caused the fluid discovered in his brain. Respondent noted that even Dr. Rosado from Lurie's included a notation about BESS being a possible explanation for M.W.'s head injury in his records. Included with her request to postpone the hearing, she also sought the court's permission to obtain an expert to review the medical records. The court granted her motion to postpone the adjudicatory hearing and asked respondent's attorney to bring in the name of a potential expert for the court's review.

¶ 11    Thereafter, respondent's fourth attorney filed a motion requesting that the trial court vacate his appointment after issues arose between him and respondent. The court, however, denied the motion. Two months later, respondent's attorney renewed his motion, but on a different basis. The attorney asserted that, based on the medical records of M.W., there were "no classic signs of abuse" and reiterated Dr. Rosado's possible BESS diagnosis. To ensure that respondent's entitlement to an expert was reasonable, the attorney consulted with multiple doctors about the case, including Dr. Julie Mack, a pediatric radiologist and neurologist from Penn State University. All of the doctors were either unavailable or required too large a consultation fee. Dr. Mack agreed to review the medical records for free, though she did not have time to be retained on the matter. Based on the medical records, Dr. Mack opined that M.W. had " 'subdural hygroma,' " or subdural fluid, which was a benign condition that usually resolved itself. To this end, the attorney noted that the condition did resolve on its own. Given Dr. Rosado's possible explanation of BESS and Dr. Mack's definitive opinion that M.W. did have a benign condition, the attorney believed an expert was necessary for respondent's defense. However, based on the cost, neither he nor respondent could "front" the money required to obtain an expert. The attorney acknowledged that, "[e]ven without the physical abuse allegation, based on all the evidence, findings are likely," as "[t]here is a lot of evidence." Still, the attorney highlighted that "[n]on-physical abuse findings [did] not preclude reunification services with those allegations still considered." Because the attorney did not have the funds to pay for an expert and he believed respondent was entitled to one, he sought to have his appointment vacated. The trial court granted the motion, appointed the public defender to represent respondent and ultimately, the new adjudicatory hearing was scheduled for December 13, 2024.

¶ 12     On November 14, 2024, the State filed a motion to amend the petitions for the adjudication of wardship on behalf of M.W., J.D. and S.D. Therein, the State noted that, based on its review of the medical records as well as further investigation, amendments were necessary. To this end, the State sought leave to strike the allegation of abuse due to the infliction of physical injury against M.W. and the supporting factual allegations, and instead allege new facts to support allegations of M.W., J.D. and S.D. being neglected due to an injurious environment and abused due to the substantial risk of physical injury. During a discussion on the motion, the trial court, Judge Robert Balanoff, asked if respondent's attorney had any objection, and she stated that she did not. As a result, the court did not require any argument from the State and, it allowed the State's amendments.

¶ 13     The State's amended petitions alleged that M.W., J.D. and S.D. were neglected due to an injurious environment and abused due to the substantial risk of physical injury. The State asserted, as it did in the original petitions, that respondent had one prior indicated report for neglect due to an injurious environment and abuse due to the substantial risk of physical injury. But the State expounded on that prior indicated report, noting that it was from March 2019 based on an altercation between respondent and an unidentified individual in the presence of J.D. and S.D. The State additionally posited that, in January 2020, respondent was involved in an altercation with her roommate in the presence of J.D. and S.D., and in September 2021, a former roommate of respondent's shot at her residence multiple times while J.D. and S.D. were present. Further, according to the State, in November 2021, respondent was "verbally aggressive" in public while in possession of a loaded firearm, which led to her being charged and pleading guilty to aggravated unlawful use of a weapon.

¶ 14    The State also re-iterated the original factual allegation against respondent for reporting that M.W. fell off her chest yet medical professionals believing his injury was inconsistent with such a fall. In addition, the State claimed that, in October 2022, respondent attempted to leave the hospital with M.W. and refused to consent to a sedated MRI, which would have determined whether M.W. had BESS. This led to an incident in a stairwell that police and hospital security had to respond to before the situation deescalated. The State also stated that later in October 2022, DCFS sought police assistance after respondent threatened one of its investigators. Lastly, the State alleged that respondent reported she was the victim of domestic violence caused by Tawon T. in the presence of S.D. yet maintained a relationship with him.

¶ 15                              B. Adjudicatory Hearing

¶ 16    The case proceeded to the adjudicatory hearing. During the hearing, records from One Hope United, a family services provider, showed that, on March 5, 2019, S.D. was misbehaving and a witness observed respondent pull him by the hair. The witness confronted respondent, she became angry and hit the witness in the jaw seven or eight times in front of S.D. and J.D., which led to the police being called. Body-worn camera footage from University of Illinois Chicago Police Officer Warren Faulkner showed him responding to the school's faculty dental practice, which is where the incident occurred. Respondent was in a waiting room with S.D. and J.D., who was in an infant car seat, and she was talking to another police officer, defending herself from the accusations of the witness. During the encounter, respondent became confrontational with the officers and refused to provide her name. For much of the video, respondent was attempting to tell her side of the story and becoming frustrated when the officers, in her mind, would not listen. Although respondent conceded to becoming physical with the witness, she explained doing so because the witness followed her into the bathroom and invaded her personal space. Ultimately,

the police arrested respondent, apparently for battery based on other evidence, as the video does not show officers providing her the reason for the arrest. This incident resulted in S.D. crying hysterically and having to be consoled by one of the officers.

¶ 17    Following this incident, respondent and her children were enrolled in services through One Hope United. According to its records, respondent experienced housing instability moving between apartments and shelters, including to Indiana after feeling threatened and being harassed at a previous apartment. Despite the housing instability, the records indicate that respondent complied with services and completed them, including obtaining behavioral services for S.D.

¶ 18    In January 2020, according to an exhibit containing certified court records, respondent sought an order of protection against her roommate, John C., to protect herself, J.D. and S.D. based on an incident involving loud music where John C. allegedly became verbally aggressive toward respondent. During the incident, S.D. and J.D. became frightened, screamed and cried. Although the trial court initially granted the order of protection, it vacated the order and dismissed the case two months later after respondent did not appear in court.

¶ 19    During the hearing, various Chicago police officers testified about encounters with respondent. One encounter occurred in the early morning hours of September 19, 2021, after police responded to a shooting at her residence. Based on an interview with respondent, her former roommate, who was on parole but kicked out of the residence for drug use, returned and shot a firearm eight times at her front door while she, S.D. and J.D. were asleep on the couch. Despite the gunfire, no one in the family was hurt. Another encounter occurred on November 13, 2021, when an officer responded to a call of an assault in progress. After an officer detained respondent, the officer patted her down and found a firearm. During the encounter, respondent was "extremely irate" such that additional officers had to be called to the scene. Respondent was arrested based on

the firearm, though none of her children were present. Based on the incident, according to an exhibit containing certified court records, the State charged respondent with aggravated unlawful use of a weapon for possessing the firearm without having been issued a currently valid Firearm Owner's Identification card. She pled guilty to the offense and received probation.

¶ 20    The State also admitted into evidence medical records of M.W. from Comer Children's Hospital and Lurie Children's Hospital. Earlier in October 2022—before the events initiating this case occurred—respondent brought M.W. to the emergency room due to a rash. During their visit to the emergency room, a social worker noted that respondent was yelling "loudly" in a hallway that she wanted a new nurse and a doctor to visit her son. Later, after an advanced practice nurse visited M.W. and left the room, respondent followed the nurse out into the hallway. There, respondent "started yelling" again and requesting a new nurse. Once a doctor intervened and examined M.W., respondent was "very calm" and "pleasant."

¶ 21    As for the events leading to DCFS's involvement, on October 21, 2022, respondent arrived at the emergency room of Comer Children's Hospital around 3 p.m. complaining that M.W. had fallen from a bed. A nurse triaged M.W. shortly after they arrived and observed a small bruise on the left side of his forehead. However, around 8 p.m., when respondent and M.W. were called for a room, they had already left the hospital. In the early afternoon hours of October 23, 2022, respondent and M.W. returned to the emergency room of Comer Children's Hospital after M.W. was acting abnormally. Based on M.W.'s symptoms and history, a doctor ordered a CT scan, which initially came back as normal, resulting in M.W. being discharged the following day. However, a subsequent review of the CT scan revealed a fracture and subdural fluid on both sides of the brain. Due to the findings, the hospital called respondent, demanding she bring M.W. back to the

emergency room for an MRI. Respondent initially told the hospital she would return, but ultimately never did.

¶ 22    The records from Lurie Children's Hospital showed that respondent instead went to its emergency room, arriving around 3 p.m. Respondent explained to a doctor what happened at Comer's, but chose not to return there due to a bad experience. Lurie's was unable to obtain the CT scan from Comer's, but a doctor noted that respondent's description of the second read of the CT scan "cannot be concretely applied to current injury timeline." The doctor ordered another CT scan, which did not reveal a fracture, but did show subdural fluid on both sides of M.W.'s brain. After reviewing the imaging and history, Dr. Rosado of Lurie's wrote that M.W. had "bifrontal hyperdense subdural collections in the context of mildly prominent subarachnoid spaces (BESS ???) [*sic*]." However, Dr. Rosado noted that respondent's report of M.W. having a short fall did "not provide a plausible explanation for the subdural collections observed as the collections have the appearance of non-acute blood. Similarly, to date, there is no medical condition that could explain these subdural collections. In the absence of BESS, [M.W.'s] bifrontal subdural collections raise a significant concern for nonaccidental trauma." Dr. Rosado remarked that a sedated MRI of M.W.'s brain and spine was recommended to obtain additional "information about the intracranial findings and screen for spinal injuries." Ultimately, the MRI did not occur.

¶ 23    Lurie's records also detailed respondent's interactions with various staff. In the morning of October 25, 2022, a social worker and hospital security had to be called due to respondent's behavior, which included being "combative" with requests to complete necessary and recommended "work ups" for M.W. and "cursing" at medical staff. Later in the day, a nurse with the behavioral response team had to be called due to respondent "screaming and [being] agitated in the hallway." Even later in the day, when Dr. Rosado discussed the need for M.W. to undergo

a sedated MRI, respondent refused unless she was able to be present, which was not possible. During this conversation, respondent "became escalated" and had an argument with her sister, which included them "cursing and yelling" at each other. Due to respondent's "continued escalation," hospital security had to be called. Eventually, respondent left the room with M.W., and the hospital had to activate a missing person alert. Security confronted respondent in a stairwell landing, which necessitated police involvement before the situation deescalated.

¶ 24    Tiara Long, the DCFS investigator, testified and provided additional context to respondent's time at Comer's and Lurie's. Long was assigned to the case on October 25, 2022, to investigate a DCFS hotline call regarding M.W. During a phone call, respondent told Long that she disagreed with Lurie's advice to have M.W. undergo a sedated MRI because of his age. During another phone call with Long, respondent expressed frustration about the situation, but agreed to let M.W. have an MRI so long as he was not sedated and noted she was attempting to schedule a time for him to receive the MRI at Advocate Hospital. During this conversation, respondent agreed to a safety plan for J.D. and S.D., allowing them to be placed with her sister.

¶ 25    The next day, however, respondent texted Long that she no longer consented to the safety plan, and she wanted J.D. and S.D. back. Long called respondent, who was "irate" and "cursing," and told Long that she was going to get her children from her sister. Based on the circumstances, in particular M.W. having an "unexplained head injury," Long and a supervisor determined that DCFS needed to take protective custody of J.D. and S.D., which Long did from the residence of respondent's sister. When Long attempted to take protective custody of M.W. from respondent's residence, she refused to give up M.W., cursed at Long and threw a DCFS investigation notification document back at her. Feeling "threatened," Long left and came back with police, but respondent refused to leave her residence or allow anyone inside, which forced Long to obtain a

child protection warrant. According to Long, after talking with J.D. and S.D., both of them reported feeling safe and happy with respondent, and Long never observed any signs of physical abuse on them. Long acknowledged that, despite the MRI being requested by Lurie's, M.W. never underwent an MRI, even while he was in protective custody.

¶ 26    Just as a third police officer was going to testify about another encounter with respondent, her attorney objected based on relevance given that the officer was going to testify about events occurring after the State had filed its original petitions. The trial court, Judge Andrea M. Buford, allowed the testimony and stated it would give "it the weight it deserves." The third incident occurred in February 2023, when officers responded to a "domestic related" incident involving respondent. According to the officer, respondent made a statement about a prior incident between her and Tawon T. When asked what respondent said, the officer testified: "The domestic battery, and I believe it was a rape that happened two years prior. And she stated that she was lying about it." According to the officer, respondent "made a police report. She did state she made a police report, and that she lied to the police." When the incident two years' prior occurred, "[b]oth of her children" were present—though the officer did not recall if they were asleep or awake.

¶ 27    Thereafter, the State rested, as did the minors' guardian *ad litem* without presenting any evidence. Respondent testified in her defense asserting that Long lied about "almost everything," including when she first took M.W. to the hospital, when DCFS took protective custody of her children and that she had agreed to a safety plan for J.D. and S.D. Respondent also disputed her confrontation with Long at her residence, explaining that she refused to turn over M.W. to a stranger without any official court documentation. When Long returned to respondent's residence with the police, Long again did not produce a court order, and according to respondent, even the officer told Long he could not force someone to turn over her child without a court order.

¶ 28 Following the parties' arguments, the trial court found that the State met its burden to show the minors were neglected due to an injurious environment and abused due to the substantial risk of physical injury. The court highlighted respondent's altercation with police at the University of Illinois Chicago's dental practice, where she was "irate," "screaming," "cursing" and refusing to cooperate, all in front of S.D. and J.D. who were "crying." The court further noted that there was a history of domestic violence that occurred in front of the children during the time in which she "resided with [John C.]," which led to her obtaining an order of protection. The court observed that respondent allowed a parolee to live with her, who shot up her residence after he was kicked out, where she and her children were sleeping. The court remarked that respondent pled guilty to a firearms offense and exhibited "an extensive history of poor decision making, combative behaviors, extreme anger issues including being irate and cursing in front of her children often involving law enforcement." What is more, according to the court, respondent threatened Long and refused to cooperate with medical personnel at the hospital following M.W.'s admission. The court also entered a written order for each minor consistent with its oral findings.

¶ 29                                C. Dispositional Hearing

¶ 30 Following the adjudicatory hearing, the trial court held a dispositional hearing where, following testimony and argument, it adjudged M.W., S.D. and J.D. wards of the court based on respondent being unable for some reason other than financial circumstances alone to care for, protect, train or discipline them. The court concluded it was in the best interests of the minors to remove them from respondent's custody, terminated its temporary custody order and ordered the minors placed with the DCFS guardianship administrator. The court also entered permanency orders for each minor, finding that the appropriate goal was to return home within 12 months.

¶ 31 This appeal follows.

¶ 32                                II. ANALYSIS

¶ 33    At the outset, as the State notes in its brief, respondent's brief fails to comply with Illinois Supreme Court Rule 341(h) (Oct. 1, 2020) in multiple respects, including her failure to include an introductory paragraph stating, *inter alia*, the nature of the action, a statement on the issues presented for review, a statement of jurisdiction and "[a] short conclusion." While the State is correct, we do not find these violations so egregious as to warrant any punitive action on appeal. See *Spangenberg v. Verner*, 321 Ill. App. 3d 429, 432 (2001) (declining to take any punitive action for an appellant's failure to comply with Rule 341(h) because "none of the violations of the rules are so flagrant as to hinder or preclude review").

¶ 34                      A. Amendment of the State's Petitions

¶ 35    Turning to respondent's contentions on appeal, she first contends that the trial court should have denied the State's motion to amend its petitions for the adjudication of wardship where the State made its motion only a month before the scheduled adjudicatory hearing, the proposed amendments were calculated only to cause surprise and confusion, and they did not cure a defect in the pleadings but rather replaced the factual insufficiency of the original allegations.

¶ 36    Under section 2-13(5) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-13(5) (West 2022)), "[t]he court shall liberally allow the petitioner to amend the petition to set forth a cause of action or to add, amend, or supplement factual allegations that form the basis for a cause of action up until 14 days before the adjudicatory hearing." The court has broad discretion to allow an amended petition, and we will not reverse the court's decision unless it abuses that discretion. *In re Tyrese J.*, 376 Ill. App. 3d 689, 702 (2007).

¶ 37    In the instant case, respondent concedes that the State's motion to amend, which was filed approximately one month before the scheduled adjudicatory hearing, was timely under the Act.

Nevertheless, in arguing that the court erred in allowing the amendments, she posits that the State's motion seemed calculated to cause surprise and confusion, resulting in prejudice to her. However, the Act has a mechanism to guard against any resulting prejudice from the liberal policy of allowing the State to amend its petition. Section 2-13(5) of the Act (705 ILCS 405/2-13(5) (West 2022)) provides: "In all cases in which the court has granted leave to amend based on new evidence or new allegations, the court shall permit the respondent an adequate opportunity to prepare a defense to the amended petition."

¶ 38    When the trial court discussed the State's motion to amend, it asked respondent's attorney if she had an objection, and she responded that she did not. By consenting to the State's amendments and not requesting additional time to prepare a defense, respondent's attorney essentially conceded that she was not prejudiced by the timing of the amendments. But even more important, under the invited-error doctrine, "a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Respondent cannot now complain that the court abused its discretion when her attorney consented to the amendments.

¶ 39    Although respondent concedes that her attorney did not object to the State's amendments, she asserts that this court can still review the error through the plain-error doctrine, or because forfeiture and waiver are limitations on the parties, not the court. None of these workarounds apply. "[I]nvited error or acquiescence does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." (Internal quotation marks omitted.) *People v. Quezada*, 2024 IL 128805, ¶ 59. And invited error " 'goes beyond mere waiver' such that the traditional exceptions to the waiver rule do not apply." *In re Detention of Swope*, 213 Ill. 2d at 218 (quoting *People v. Villarreal,* 198 Ill. 2d 209, 227 (2001)). Respondent is simply

estopped from raising any claim that the trial court erred in allowing the State to amend its petitions.

¶ 40    Respondent does, however, argue in her reply brief that her attorney provided ineffective assistance by failing to object. But a party cannot raise such a claim for the first time in a reply brief. See Ill S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief ***."); *People v. Denwiddie*, 2025 IL App (3d) 240175-U, ¶ 18 (declining to address an ineffective assistance of counsel argument made for the first time in a reply brief because doing so would deprive the State of an opportunity to respond).

¶ 41    Nevertheless, even if we could reach the merits of respondent's claim, we would be hard pressed to find any error. As noted, there is a liberal policy of allowing the State to amend its petitions when it does so more than 14 days before the adjudicatory hearing (see 705 ILCS 405/2-13(5) (West 2022)), which occurred here. This liberal policy coupled with the quite deferential abuse-of-discretion standard of review (see *In re D.T.*, 212 Ill. 2d 347, 356 (2004)) would almost assuredly not provide respondent success on this claim. Consequently, we cannot find the trial court erred in allowing the State to amend its petitions for the adjudication of wardship.

¶ 42                                B. Temporary Custody

¶ 43    Respondent next raises two contentions related to the trial court's temporary custody order. According to respondent, as the proceedings ensued, the medical evidence demonstrated that the physical abuse allegation against her was meritless, which caused the State to amend its petitions and change its theory of abuse and neglect from a concrete allegation of physical abuse at one particular time to a theory of general irresponsibility based on various incidents over the years. Based on this, respondent argues that the court should have *sua sponte* vacated the temporary custody order, or, at the very least, held a new temporary custody hearing. Respondent also argues

that her attorneys should have moved to vacate the temporary custody order based on the physical abuse allegations appearing meritless, evidence that was available to her attorneys throughout the proceedings. And, according to respondent, their failure to do so constituted ineffective assistance.

¶ 44 Before addressing the merits of respondent's contentions related to the temporary custody of M.W., J.D. and S.D., we must address whether these contentions of error are moot, as the State argues. An issue on appeal becomes "moot if no controversy exists or if events have occurred which foreclose the reviewing court from granting effectual relief to the complaining party." *In re Shelby R.*, 2013 IL 114994, ¶ 15. As a general matter, issues related to temporary custody become moot when "there is a subsequent adjudication of wardship supported by adequate evidence." *In re Edward T.*, 343 Ill. App. 3d 778, 792 (2003).

¶ 45 In the instant case, the trial court entered a dispositional order, where it terminated the temporary custody order, adjudged the minors wards of the court and granted custody of the minors to the DCFS guardianship administrator. Given the dispositional order, any relief we could afford respondent now based on issues related to the temporary custody of her children is futile because there no longer is temporary custody of her children given the dispositional order. See *In re A.D.W.*, 278 Ill. App. 3d 476, 480 (1996) (concluding that the respondent's contention that the trial court erred during a shelter-care hearing was moot because, "[e]ven if we were to determine the trial court erred at the shelter-care hearing, DCFS would still retain custody of A.D.W. pursuant to the findings at the subsequent dispositional hearing"). Because subsequent events have prevented this court from granting respondent effectual relief, the temporary custody issues are moot. See *In re Shelby R.*, 2013 IL 114994, ¶ 15.

¶ 46 "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues

are decided." *In re Marriage of Donald B*, 2014 IL 115463, ¶ 32. However, there are three recognized exceptions to the mootness doctrine: "(1) when resolution is in the public's interest, (2) where the issue is capable of repetition yet evading review, and (3) where collateral consequences to the appellant arise from the judgment." *In re V.S.*, 2025 IL 129755, ¶ 55. Generally, the party invoking an exception has the burden to show it applies. *Koshinski v. Trame*, 2017 IL App (5th) 150398, ¶ 20. Only the public-interest exception is at issue here, and under this exception, there are three elements that must be met: "(1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will recur." *McHenry Township v. County of McHenry*, 2022 IL 127258, ¶ 50. The "exception is narrowly construed, but it applies where the court's action is warranted due to the magnitude or immediacy of the interests at issue." *Id.* For a question to be of a sufficient public nature, the question must have "a significant effect on the public as a whole." *Felzak v. Hruby*, 226 Ill. 2d 382, 393 (2007).

¶ 47    Although respondent argues in a conclusory fashion that we can consider this moot issue under the public-interest exception, she presents no case law on the exception and never fully develops the argument. See Ill S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities ***"). Regardless, the exception does not apply. Issues related to temporary custody are dependent on the facts and circumstances of each individual case, requiring the trial court to "make a number of determinations with regard to the minor." *In re A.H.*, 195 Ill. 2d 408, 417 (2001). These include whether there is probable cause of abuse or neglect, and whether it is in the best interests of the minor to be temporarily placed outside the home. 705 ILCS 405/2-10(1), (2)

(West 2022). Child protection cases are "*sui generis* and must be decided based on the particular facts and circumstances presented." *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 48    When cases are dependent on the unique facts and circumstances presented, our supreme court has declined to apply the public-interest exception. See *In re Marriage of Eckersall*, 2015 IL 117922, ¶¶ 5-6, 10, 19 (where, in a dissolution of marriage proceeding, a wife challenged an interlocutory order governing the terms and conditions of visitation that was superseded by the parties' final dissolution of marriage order, the supreme court found the challenge moot and declined to invoke the public-interest exception, finding "[i]ssues that arise in dissolution of marriage proceedings tend to be very fact specific and do not have broad-reaching implications beyond the particular dissolution of marriage proceedings," resulting in the issue involved having "a limited application" that did "not have a significant effect on the public as a whole"). The temporary custody issues here are heavily dependent upon the facts and circumstances of this particular case and do not have broad-reaching implications beyond the case. The issues here therefore are not of a public nature.

¶ 49    We recognize that, in *In re E.C.-F.*, 2022 IL App (2d) 210675, ¶ 10, the appellate court found that a respondent's challenge to a temporary custody order—later superseded by a dispositional order—was moot yet chose to review the issue under the public-interest exception. See also *In re Patricia S.*, 222 Ill. App. 3d 585, 589 (1991) (reviewing moot temporary custody orders under the public-interest exception to the mootness doctrine where the temporary custody issue involved the trial court's failure to comply with statutory due process safeguards). But these decisions are outliers among Illinois decisions discussing whether temporary custody issues are moot and whether any exceptions could apply. Some decisions have explicitly considered whether an exception could apply and found that none did. See *In re V.M.-L.*, 2022 IL App (1st) 220773-

U, ¶¶ 16-19; *In re Jeremiah C.*, 2013 IL App (1st) 130390-U, ¶ 46; *In re A.D.W.*, 278 Ill. App. 3d at 480. And some decisions have simply found the temporary custody issues moot without discussing any exceptions. See *In re D.C.*, 2023 IL App (1st) 221327-U, ¶ 32; *In re M.B.*, 2021 IL App (4th) 210182-U, ¶ 24; *In re A.T.*, 2021 IL App (2d) 200583-U, ¶ 54; *In re N.M.*, 2020 IL App (4th) 190662-U, ¶¶ 49-50; *In re A.W.*, 2018 IL App (4th) 170944-U, ¶ 25; *In re J.W.*, 386 Ill. App. 3d 847, 851-52 (2008). In light of the temporary custody issues here being dependent on the facts and circumstances of the case, resulting in them not having a significant effect on the public as a whole, and consistent with the vast majority of decisions not applying an exception to the mootness doctrine for temporary custody issues, the public-interest exception does not apply. Consequently, we do not address respondent's challenges to the temporary custody in her case.

¶ 50                                    C. The State's Allegations and Proof

¶ 51    Respondent next contends that, in the State's amended petitions for the adjudication of wardship, it failed to state a claim that M.W., J.D. and S.D. were neglected due to an injurious environment or abused due to the substantial risk of physical injury.

¶ 52    Respondent concedes that she failed to contest the sufficiency of the allegations of the State's amended petitions in the trial court. "Although termination of parental rights proceedings involve fundamental liberty interests, they are civil in nature and governed by the Code of Civil Procedure." *In re S.L.*, 2014 IL 115424, ¶ 17. Under section 2-612(c) of the Code of Civil Procedure (735 ILCS 5/2-612(c) (West 2022), "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived." Despite this waiver rule, the State's petition must state a cause of action. *In re S.L.*, 2014 IL 115424, ¶ 17. To this end, "courts in this state recognize that the forfeiture rule is relaxed when the State's termination petition fails to state a cause of action." *Id.*; *In re John Paul J.*, 343 Ill. App. 3d 865, 878 (2003) ("Only where a pleading

wholly and absolutely fails to state any cause of action can an objection be raised for the first time on appeal."). Indeed, that is what respondent is arguing, and thus, we may address her claim that the State's petitions failed to state a claim that M.W., J.D. and S.D. were neglected or abused even though she has raised the claim for the first time on appeal.

¶ 53    Under section 2-13(2) of the Act (705 ILCS 405/2-13(2) (West 2022)), a petition for an adjudication of wardship:

> "shall allege that the minor is abused, neglected, or dependent, with citations to the appropriate provisions of this Act, and set forth (a) facts sufficient to bring the minor under Section 2-3 or 2-4 and to inform respondents of the cause of action, including, but not limited to, a plain and concise statement of the factual allegations that form the basis for the filing of the petition ***."

Respondent essentially attempts to pick apart each allegation made by the State in their amended petitions and argue that each allegation alone is insufficient to a state a claim for neglect due to an injurious environment and abuse due to the substantial risk of physical injury. But it is not each individual allegation that the State relied on to set forth its claims of neglect and abuse, but rather the totality of the allegations. See *In re L.S.*, 2022 IL App (1st) 210824, ¶ 130 ("In keeping with our duty to liberally construe the allegations contained in the petition for adjudication of wardship and draw all reasonable inferences in the light most favorable to the State, we consider the petition's allegations *in toto*."). The totality of the State's allegations sufficiently set forth facts to state claims that M.W., J.D. and S.D. were neglected and abused, as defined by section 2-3 of the Act. 705 ILCS 405/2-3 (West 2022).

¶ 54    We now turn to respondent's final contention that the State failed to sufficiently prove that M.W., S.D. and J.D. were neglected or abused. At the adjudicatory hearing, the trial court must

determine whether the minor is abused or neglected. *Id.* § 2-18(1). In this case, the State alleged that M.W., S.D. and J.D. were neglected due to an injurious environment and abused due to a substantial risk of physical injury. *Id.* § 2-3(1)(b), (2)(ii).

¶ 55    We begin with the trial court's findings of neglect due to an injurious environment. The term "neglect" means "the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 22. It is construed broadly and encompasses "wilful as well as unintentional disregard of duty." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). "It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* The term "injurious environment" is "an amorphous concept that cannot be defined with particularity." *Id.* But generally, it means "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.* Cases involving neglect "must be decided on the basis of their unique circumstances." *Id.* The State has the burden to prove the allegations of neglect by a preponderance of the evidence, *i.e.*, the allegations are "more probable than not." *In re V.S.*, 2025 IL 129755, ¶ 51. We will not reverse the court's finding of neglect unless it is against the manifest weight of the evidence (*id.* ¶ 52), which occurs where "the opposite conclusion is clearly evident." *In re Z.L.*, 2021 IL 126931, ¶ 61.

¶ 56    In the instant case, the State's evidence showed a continuous pattern of respondent's conduct placing her children in unsafe and damaging environments. Although the focus at the adjudicatory hearing "is whether or not a child is neglected, and not whether every parent is neglectful" (*In re Arthur H.*, 212 Ill. 2d at 467), "that does not mean that the court disregards parental conduct in deciding whether there was an injurious environment." *In re K.F.*, 2023 IL

App (1st) 220816, ¶ 47. "Clearly, parental conduct may be considered in assessing whether a parent has breached his or her duty to provide a safe environment." *Id.*

¶ 57    First, respondent has a history of allowing people to live with her who create volatile living situations. She allowed a recent parolee to live with her and her children, who ended up using drugs in the house and had to be kicked out. Thereafter, that individual returned to respondent's residence and discharged a firearm several times at her front door while she and her children slept in the living room. While respondent undoubtedly made the correct decision to kick that individual out, she made a questionable decision—one that almost had irreversible consequences—in allowing that individual to reside with her family in the first instance. See *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995) (observing that "[p]arents have the duty to protect their children from harm"). Respondent certainly did not intend to have her ex-roommate shoot at her residence, but it nevertheless occurred due to a decision she made in allowing the person to live with her in the first place. See *In re Arthur H.*, 212 Ill. 2d at 463 (neglect encompasses unintentional acts as much as willful ones). Then, there is John C., the roommate for which respondent had to obtain an order of protection based on an incident in which he became verbally aggressive toward her in front of her children, which caused them serious distress. This scarring incident contributed to a deleterious environment for her children. See *In re M.K.*, 271 Ill. App. 3d at 826 (where a mother allowed a man to reside with her and her children despite knowing his history of abuse and having a bad temper, she "created an environment injurious to their welfare").

¶ 58    Furthermore, there was testimony that Tawon T., the biological father of M.W. and J.D., had physically and sexually assaulted her in the past, including in the presence of at least S.D., yet she apparently lied about the incident to the police. Although the trial court made a finding in this regard, but asserted that John C. committed the domestic violence, it appears the court innocuously

conflated John C. with Tawon T., as despite the verbal altercation, there is no evidence that John C. was physically violent toward respondent. See *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (minor misstatements of the evidence that do not affect the foundation of the trial court's ruling are not a basis for reversible error). There is nothing in the evidence to show that respondent was anything but an innocent victim of Tawon T., yet she nevertheless lied to police about the incident from 2021 and apparently continued a relationship with him despite it, which resulted in M.W.'s birth in July 2022. Respondent's continued involvement with Tawon T. helped expose some of her children, as it was unclear from the testimony which children were present, to an injurious environment. See *In re Sharena H.*, 366 Ill. App. 3d 405, 417 (2006) (evidence of the mother's involvement "in an abusive relationship" with her daughter's father helped expose the daughter to an injurious environment). While there is no evidence that M.W., J.D. or S.D. were ever harmed physically during any of these incidents, "a finding of an 'injurious environment' does *not* require a showing of actual harm," as "courts need not wait for a child to get hurt." (Emphasis in original.) *In re K.F.*, 2023 IL App (1st) 220816, ¶ 49. As the trial court found, respondent has a history of poor decision making and conduct, which has led directly to her children being stripped of a safe and nurturing environment.

¶ 59    Respondent has also been involved in several confrontations in front of one or more of her children involving random individuals, the police, medical professionals and DCFS. There was the incident at the University of Illinois Chicago dental practice, where respondent punched someone who accused her of abusing S.D. seven or eight times in front of S.D. and J.D. During this same incident, respondent, when discussing what happened with the police, became irate, confrontational and swore at the officers. S.D. was clearly distressed by the incident, as he began crying hysterically as respondent was led out of the dental practice in handcuffs. Additionally,

there were multiple incidents occurring at Comer Children's Hospital and Lurie Children's Hospital as well as with DCFS investigator Long, where respondent exhibited uncivil behavior, as the trial court noted in its findings. These incidents, as exhibited by S.D.'s reaction to her mother being arrested, have led to respondent's children being stripped of a safe and nurturing environment, and instead placed them in, oftentimes, chaotic and volatile situations. Certainly, a parent's display of temper directed away from her family, standing alone, would not support a neglect finding (see *In re N.B.*, 191 Ill. 2d 338, 353-54 (2000)), but this is not a case of just respondent's bad temper. As demonstrated, there is evidence of respondent acting uncivilly plus much more that has placed her children in environments lacking nurture and safety.

¶ 60 Furthermore, respondent has a prior indicated report based on the March 2019 incident from the University of Illinois Chicago dental practice, which supports a neglect finding. See *In re A.W.*, 2024 IL App (1st) 221700-U, ¶ 29. Respondent also pled guilty to aggravated unlawful use of a firearm. Although there is no evidence that her children were present during the incident involving the firearm, respondent's willingness to illegally possess a firearm does not instill a safe and nurturing environment for her children. Admittedly, as Long testified, both J.D. and S.D. reported feeling safe and happy with respondent. But it is unrealistic to expect young children to grasp the gravity of their living situation and willingly leave their primary, if not sole, caretaker. In light of the foregoing, we cannot say that it is clearly evident that M.W., J.D. and S.D. were not neglected due to an injurious environment. Consequently, the trial court's finding of neglect is not against the manifest weight of the evidence.

¶ 61 Because the trial court's conclusion that M.W., J.D. and S.D. were neglected due to an injurious environment is not against the manifest weight of the evidence, we need not also determine whether its finding that they were abused due to the substantial risk of physical injury

is against the manifest weight of the evidence. "[A] single finding of neglect, abuse, or dependency is enough to affirm the judgment of the circuit court." *In re V.S.*, 2025 IL 129755, ¶ 58. Consequently, we affirm the court's abuse and neglect findings.

¶ 62                                III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.